**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 92-4790
_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

BILL WILDER,

                              Defendant-Appellant.

_____

Appeal from the United States District Court
For the Eastern District of Texas
_____
(February 22, 1994)

Before DUHE, EMILIO M. GARZA, Circuit Judges, and BLACK, District Judge.[*]

EMILIO M. GARZA, Circuit Judge:

Defendant Bill Wilder pled guilty to one count of conspiring to defraud an agency of the United States, in violation of 18 U.S.C. § 371, and one count of defrauding a financial institution, in violation of 18 U.S.C. § 1344, pursuant to a plea agreement with the government. The district court sentenced Wilder to a seventy-one month term of imprisonment and three years supervised release. The district court also imposed a fine of four million dollars.

_____

    [*]    Chief Judge of the Northern District of Texas, sitting by designation.

Wilder now appeals his sentence on several grounds.  We affirm in part and reverse and remand in part.

## I

Wilder, a licensed attorney and a self-described "land trader/developer," sought to build several hotels and to purchase a federally-insured depository institution.  Wilder procured the assistance of Mark Hale, the president and chief executive officer of General Savings Association ("GSA"),[1] to help obtain funding for these projects.  Hale then caused several loans to be made to Wilder, or for his benefit, that were not reflected in the regular loan files of GSA.[2]  Wilder also requested, and received, from GSA several irrevocable letters of credit,[3] many of which were typed on GSA stationery in Wilder's law office by Wilder's employees.  Like the loans, Hale did not cause the letters to be identified in GSA's records and their existence was not disclosed to federal bank examiners. Wilder then used these letters as collateral on loans he

---

[1]     Wilder was a stockholder  of GSA and the majority stockholder, founder, and chairman of the board of Bedford Savings Association ("BSA"), both of which were insured by the Federal Savings and Loan Insurance Corporation.

[2]     Hale apparently caused the loans to be erroneously identified as "simple interest loans," which did not require that the recipient of the loans be identified.  Moreover, Hale kept the ledger reflecting the true extent of GSA's loans to Wilder in his office and did not show it to federal banking authorities or to GSA's board of directors.

[3]     A letter of credit is "[a]n engagement by a bank . . . made at the request of a customer that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." Black's Law Dictionary 903-04 (6th ed. 1990).

received from other financial institutions.  Additionally, Wilder obtained several fraudulent certificates of deposit, which he used as collateral for loans, listing GSA as the depository institution.

Hale and Wilder also joined forces to conceal from GSA's board of directors Wilder's involvement in GSA's purchase of a tract of land in Bedford, Texas.  Wilder purchased the land in 1984 for $1.375 million.  Approximately one year later, Hale presented to GSA's board a proposal to purchase the land as investment property.  Hale, however, informed the board that the land was owned by R.J. Kinney, one of Wilder's business associates.  After GSA's board approved the purchase, Wilder deeded the land to Kinney, and Kinney received the $1.823 million purchase price.  Kinney then gave Wilder the sale proceeds, and Wilder ultimately paid Hale a kickback of over $25,000.

Subsequently, Wilder, Kinney, and Toni Lockridge formed G & K Development, Inc. ("G&K") to purchase property near the Dallas-Fort Forth Airport that Wilder had previously agreed to purchase.  Kent Glasscock became a director of G&K, and Wilder signed an agreement assuming liability on any loan obtained to purchase the property and releasing Glasscock, Kinney, and G&K from liability.  G&K then obtained a loan from Bedford Savings, with part of the proceeds used to purchase the land and part used by Wilder to pay various debts.  When Glasscock complained to Wilder that G&K was actually a "front" for Wilder, Wilder caused BSA to release Glasscock from liability on the loan.  Freeport Development, Inc., a company

-3-

listing Kinney as a director, later purchased the land from G&K using loan funds provided by BSA.[4] This loan then was transferred to GSA in an attempt to hide its existence from bank examiners; Hale caused GSA to assume the loan without the knowledge of GSA's board.

After a lengthy government investigation, Wilder, Kinney, and Glasscock were indicted on numerous charges of defrauding GSA and BSA. One the eve of trial, Wilder and the government entered into a plea agreement requiring Wilder to plead guilty to one count of conspiring to defraud an agency of the United States and one count of defrauding a financial institution. The agreement also provided that the government would recommend a reduced sentence if Wilder assisted the government in investigating or prosecuting other individuals. After debriefing Wilder on several occasions, the government ultimately determined that Wilder had not provided sufficient cooperation and refused to move for a reduced sentence. Wilder then filed a motion to compel specific performance of the plea agreement, which the district court denied. Wilder now appeals this ruling and the sentence ultimately imposed by the district court.

---

[4]     Wilder's law firm performed the legal work on this transaction. In response to a request by the president of BSA for all documents prepared by Wilder's firm regarding the Freeport transaction, however, Wilder denied that his firm prepared any documents.

Wilder first argues that the government, in the plea agreement, agreed to file a § 5K1.1 motion requesting a downward departure in his sentence,[5] and that the government breached this promise by not filing the motion.  The government contends the Departure Committee for the Eastern District legitimately determined that the government should not move for a § 5K1.1 departure because Wilder had not provided substantial assistance.[6] The disputed provision in the plea agreement provided:

> [I]n the event it is determined that [Wilder] provides substantial assistance in the investigation and/or prosecution of other individuals, the United States will move the court to depart downward from the guidelines under Section 5K1.1.  BILL WILDER understands that even <u>if</u> such a motion is made, that the court has sole discretion to grant or deny the motion.

This agreement bound not only the prosecutor in the Eastern District, but also federal prosecutors in other districts who were pursuing possible charges against Wilder.

---

[5]      The Sentencing Guidelines provides that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines."   United States Sentencing Commission, *Guidelines Manual*, § 5K1.1 (Nov. 1991).

[6]      The  United  States Attorney's office for the Eastern District  of  Texas   determines  whether  to  recommend  a  § 5K1.1 departure  in  a  particular  case  by  referring  the  matter  to  its Departure  Committee.   Pursuant  to  the  office's  policies,  the prosecutor informs the committee of the extent, nature, and quality of a defendant's assistance.  A defendant also has the opportunity to submit a statement to the committee.  Here, the members of the committee unanimously voted not to move for a downward departure.

**A**

"Whether the government's conduct violated the terms of the plea agreement is a question of law." *United States v. Watson*, 988 F.2d 544, 548 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 698 (1994). Wilder, as the party alleging a breach of the plea agreement, bears "the burden of proving the underlying facts establishing a breach by a preponderance of the evidence." *Id.* "In determining whether the terms of the plea bargain have been violated, the court must determine whether the government's conduct is consistent with the parties' reasonable understanding of the agreement." *United States v. Valencia*, 985 F.2d 758, 761 (5th Cir. 1993).

**B**

Wilder submits that a letter written by Charles W. Cobb, a Justice Department trial attorney in the Northern District of Texas, demonstrated that Wilder provided substantial assistance, thereby obligating the government to file the motion for downward departure.[7] Wilder also contends that he was prepared to provide

---

[7] Cobb's letter stated: (1) Although Wilder was initially reluctant to provide details of various transactions, Wilder later was "much more forthcoming" and provided "numerous documents" and "information [that] helped in the investigation of other individuals at Bedford Savings Association." (2) Wilder testified before a grand jury "concerning numerous transactions" and "indirectly" helped the government obtain two indictments. (3) Wilder's cooperation also may have convinced Bedford's former president to plead guilty to conspiracy to commit bank fraud. (4) Wilder additionally testified before the grand jury about kickbacks that he received from Edward Richter; "[a]s a result of [Wilder's] known cooperation, Edward Richter pled guilty" to two bank fraud offenses. (5) Wilder's cooperation "likewise led to a guilty plea

additional assistance to the government, but the government informed him that it did no longer needed his assistance. The government, on the other hand, argues both that the plea agreement allowed the government to determine whether Wilder provided substantial assistance and that the Departure Committee's good-faith determination that Wilder had not provided substantial assistance was correct.[8]

---

by William Kemp" to making false statements, and Cobb anticipated that information provided by Wilder would "lead to future indictments." (6) Finally, Wilder provided "very valuable" information and documents during an investigation of Bedford's comptroller; "[a]s a result of Mr. Wilder's cooperation," Cobb anticipated "an indictment against the comptroller . . . in the near future." The prosecutor did not submit Cobb's letter to the Departure Committee because it was not written until after the Committee had met.

In the same vein, we note that the government, while declining to file § 5K1.1 motion, filed a motion before sentencing detailing Wilder's cooperation. The motion reported that Wilder "responded to every request for documents by the Government," "furnished voluminous documents" regarding his own case, and "met with several agents of the F.B.I. at their convenience and discussed what he knew about what they inquired." This motion also referenced and included Cobb's letter.

[8] The prosecutor in this case, Assistant United States Attorney Larry Eastepp, submitted two letters to the committee detailing Wilder's assistance. The first, from government agent Norman Middleton to Eastepp, stated: (1) Wilder provided documents relating to the prosecution of Glasscock; "[a]lthough these documents did not result in conviction, Wilder's cooperation was helpful." (2) "Wilder allowed the Government access to any documents in his possession and at times allowed his accountants to assist the Government in the analysis of these records." (3) Wilder's grand jury testimony against Ed and Devon Richter "substantiated the information which the Government already had, strengthening the Government's case," although the government "had enough information without Wilder's testimony to prosecute the Richters." "In summary," Middleton concluded, "Wilder's information was true, accurate, and assisted the prosecution of several individuals, but came at a time when the Government was already positioned to prosecute these people, without Wilder's

In *United States v. Hernandez*, 996 F.2d 62, 63 (5th Cir. 1993), a case involving facts remarkably similar to the case at bar, the plea agreement provided that "if Mr. Hernandez should provide substantial assistance to the Government, . . . the Government *may* make a motion for downward departure at sentencing." When the government refused to move for a downward departure, Hernandez sought to compel the government to do so, arguing that "he provided every bit of assistance within his power." *Id.* at 64. The district court, explicitly finding that Hernandez had not provided substantial assistance, rejected Hernandez's claim that the government breached the plea agreement. We vacated Hernandez's sentence, however, because the district court did not "determine whether the government's conduct [was] consistent with the parties' reasonable interpretation of . . . what might constitute substantial assistance." *Id.*

---

assistance."

     The second letter, from Eastepp to the committee, stated: (1) Wilder did not testify in the Glasscock trial because the plea agreement with Wilder was not reached until shortly before Glasscock's trial began, and Eastepp did not have time to debrief Wilder. (2) Other than one grand jury appearance, "Wilder [w]as not . . . asked to testify for the government" and there existed no instances "where his testimony may have been needed and was not used." (3) Wilder offered primarily historical or corroborative information about other co-conspirators. (4) Ed Richter's decision to enter into a plea agreement was "in part attributable to information that Wilder provided." (5) While Wilder "alluded to having detailed information about the criminal acts of others, . . . when pressed he [either did] not come forward with this additional information or it [w]as . . . corroborative/known information." (6) "Wilder has only reluctantly cooperated in [related civil] suits filed against him personally."

Here, as in *Hernandez*, the district court concluded))without making any discrete factual determinations as to the reasonable expectations of either Wilder or the government))that the assistance provided by Wilder was not substantial.[9]  *See id.* Although the government, and the district court, believed the information provided by Wilder to be insubstantial, "[t]he record . . . is silent as to just what the parties did believe, *at the time the plea agreement was entered into*, would constitute substantial assistance."  *Id.* (emphasis added).  Moreover, "[t]he record is simply devoid of information concerning what quantity or quality of information and cooperation the parties contemplated that [Wilder] would (but did not) provide in this case."  *Id.*  We also note the district court failed to address Wilder's claim that government investigators failed to both follow up on information he provided and fully debrief him.  *See United States v. Melton*, 930 F.2d 1096, 1098-99 (5th Cir. 1991) (noting that when a defendant, "in reliance on a [promise by the government], accepted the government's plea offer and did his part, or stood ready to perform but was unable to do so because the government had no further need or opted not to use him, the government is obliged to move for a

_____

[9]  At sentencing, the district court found that Wilder "did not render a full and complete debriefing and substantial assistance to the Government as agreed by him.  Instead, [Wilder's] assistance [was] for the most part grudging, reluctant, and not forthcoming, and he revealed information only upon specific requests."  In a memorandum opinion issued shortly after Wilder was sentenced, the district court found the government's determination that Wilder did not provide substantial assistance to be "objectively reasonable."

downward departure").  Consequently, we must remand this case for such determinations.[10]  On remand, if the district court determines that Wilder did provide substantial assistance, it must then determine whether the plea agreement obligates the government to move for a downward departure))i.e., whether the government, in the agreement, retained its discretion to refuse to move for a downward departure even if Wilder provided substantial assistance. *Hernandez*, 996 F.2d at 66;  *see also Wade v. United States*, ___ U.S. ___, 112 S. Ct. 1840, 1843, 118 L. Ed. 2d 524 (1992) (recognizing that the government could obligate itself to file a substantial-assistance motion in exchange for a defendant's guilty plea).

### III

Wilder's next contention, which is closely related to the substantial assistance issue, is that the district court erred in sentencing him based on *ex parte* information, thereby depriving him of the opportunity to rebut any incorrect factual assumptions made by the court.  Specifically, Wilder challenges the government's decision to submit *ex parte* to the district court the letters upon which the Departure Committee relied when deciding not to file the § 5K1.1 departure motion.  The government contends that Wilder had no right to examine the letters and, even if such a right exists, Wilder waived that right by not asserting it prior to sentencing.

---

[10]   We of course express no view as to the ultimate resolution of these issues.

We agree that Wilder waived any right he may have had to receive the letters submitted by the government when he failed to petition the district court for access to the letters prior to sentencing. *See United States v. Lemons*, 941 F.2d 309, 320 (5th Cir. 1991) (rejecting a claim that the district court should have provided Lemons with certain letters because "when the district court referenced that correspondence, Lemons did not object, did not request to examine it, and did not request that it be made a part of the record"). While Wilder argues that he did "object[] to the fact that he had not been permitted to even see the letters," the record reveals that Wilder did not ask the district court to order production of the letters until after he had been sentenced.[11] Consequently, we need not determine whether Wilder had a right to examine the documents submitted by the government because, if such a right exists, Wilder waived it.

---

[11] Accordingly, it is irrelevant that Wilder "repeatedly requested the information" from the *government* "but had been deprived of it." Moreover, even when Wilder broached the subject of the letters during the sentencing hearing, he did not ask the district court to order their production so that he could respond to their contents prior to being sentenced. *See* Transcript of July 28, 1992 Sentencing Hearing at 24 ("I presume the Court is aware of the fact that we have not been privy to viewing the materials that are in camera . . . ."); *id.* at 39 ("may we ask the Government to consider allowing Counsel for the Defendant access to [the letters] so we can make an adequate determination with regard to the appellate issues, Your Honor?"); *id.* at 39-40 ("I would move at this time that the Court consider unsealing [the letters] so that we can adequately and intelligently make a decision with regard to the appeal; and if we do decide to appeal, whether we can adequately respond and intelligently argue our position before the Court of Appeals.").

Wilder next asserts that the district court erred by increasing his offense level by two points for obstruction of justice.[12] Wilder contends that the district court, in finding the obstruction enhancement applicable, unlawfully relied on evidence obtained pursuant to Wilder's cooperation with the government.[13] We review the district court's finding that Wilder obstructed justice using the clearly erroneous standard. *United States v. Pofahl*, 990 F.2d 1456, 1481 (5th Cir. 1993).

The basis for the obstruction enhancement was the district court's finding that Wilder removed a loan file from BSA to hinder the government's investigation. Wilder, however, argues that he provided the loan file to the government only after the plea agreement was signed, thus barring the government from using the file against him in any way. The government failed to produce evidence demonstrating whether it obtained the loan file from Mark

---

[12] U.S.S.G. § 3C1.1 provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."

[13] The plea agreement provided that "no truthful statements made during the course of [Wilder's] cooperation will be used against him, nor . . . will any such information . . . be used in determining the applicable guideline range, with the exception of the provisions of § 1B1.8(b) of the U.S.S.G." U.S.S.G. § 1B1.8(b) provides, *inter alia*, that the government may use against a defendant any information "known to the government prior to entering into the cooperation agreement."

Hale, as it contends, or from Wilder, as Wilder contends.[14]  The government also failed to demonstrate whether it knew, prior to entering into the plea agreement, that Wilder had removed the file from BSA.  Because there is not "sufficient evidence in the record to permit the sentencing judge to conclude that [Wilder] obstructed the administration of justice," *United States v. Frances-Torres*, 869 F.2d 797, 800, we are compelled to find the district court's conclusion that Wilder obstructed justice to be clearly erroneous.[15] *See id.* at 801 (noting that § 3C1.1 should not be applied "when the prosecution has failed to procure available evidence crucial to the resolution of a controversy").  As this error affected the district court's selection of the sentence imposed, we vacate Wilder's sentence and remand for resentencing without consideration of the obstruction enhancement.  *United States v. Surasky*, 976 F.2d 242, 247 (5th Cir. 1992).

---

[14]  We note, however, that a letter sent by Eastepp to the § 5K1.1 committee reported that "[t]he main set of documents [to which the government gained access pursuant to the plea agreement] consisted of an original loan file taken out of Wilder's institution, Bedford Savings, ostensibly by Wilder."

[15]  Notwithstanding  the lack of evidence regarding the circumstances under which the government obtained the loan file, the government argues that the obstruction finding was appropriate given Wilder's tardiness in returning to the probation office the standard financial disclosure statement needed to properly complete the PSR.  However, "[a] defendant's . . . refusal to . . . provide information to a probation officer . . . is not a basis for application" of the obstruction enhancement.  U.S.S.G. § 3C1.1, comment. (n.1).  Accordingly, we do not believe that Wilder's three-month delay in returning the disclosure statement, standing alone, constitutes obstruction of justice.

Wilder next argues that he is entitled to a downward adjustment in his offense level because he accepted responsibility for his crimes. Under § 3E1.1(a) of the guidelines, "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct," the district court may reduce the defendant's offense level by two points. "The mere entry of a guilty plea, however, does not entitle a defendant to a sentencing reduction for acceptance of responsibility as a matter of right." *United States v. Shipley*, 963 F.2d 56, 58 (5th Cir.) (per curiam), *cert. denied*, ___ U.S. ___, 113 S. Ct. 348, 121 L. Ed. 2d 263 (1992).

> Entry of a plea of guilty prior to the commencement of trial combined with truthful admission of involvement in the offense *and related conduct* will constitute significant evidence of acceptance of responsibility . . . . However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.

U.S.S.G. § 3E1.1, comment. (n.3) (emphasis added). Here, the district court found that Wilder did not fully accept responsibility for his criminal acts. We review this finding using the clearly erroneous standard. *United States v. Hardeman*, 933 F.2d 278, 283 (5th Cir. 1991).[16]

---

[16]     We have not definitively determined what standard applies when reviewing a district court's refusal to credit a defendant's acceptance of responsibility. *Compare Hardeman*, 933 F.2d at 283 (applying the clearly erroneous standard) *with United States v. Thomas*, 870 F.2d 174, 176 (5th Cir. 1989) (applying the "without foundation" standard) *and United States v. Brigman*, 953 F.2d 906, 909 (5th Cir.) (applying the "great deference" standard), *cert.*

While Wilder accepted responsibility for some acts, he did not demonstrate "sincere contrition" regarding the full extent of his criminal conduct. *See United States v. Beard*, 913 F.2d 193, 199 (5th Cir. 1990). Instead, Wilder sought to minimize his participation in the offenses, blame others for his criminal activity, and resist efforts by the Resolution Trust Corporation and the probation office to investigate his financial affairs. *See United States v. Windham*, 991 F.2d 181, 183 (5th Cir.) (noting that a defendant is required under the pre-1992 guidelines to accept responsibility for all relevant criminal conduct to be eligible for a downward departure under § 3E1.1), *cert. denied*, ___ U.S. ___, 114 S. Ct. 444, 126 L. Ed. 2d 377 (1993); *United States v. Alfaro*, 919 F.2d 962, 968 (5th Cir. 1990) (same). Moreover, Wilder did not agree to plead guilty until the eve of trial, thereby putting the government to much effort and expense preparing for trial. *See* U.S.S.G. § 3E1.1, comment. (1(g)) (noting that the district court should consider "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility"). Accordingly, the district court's finding that Wilder did not accept responsibility is not erroneous.

---

*denied*, ___ U.S. ___, 113 S. Ct. 49, 121 L. Ed. 2d 16 (1992). However, "[t]here appears to be no practical difference between the three standards." *United States v. Cartwright*, 6 F.3d 294, 304 (5th Cir. 1993).

**VI**

Wilder contends that the district court erred in awarding him a four point upward adjustment for his role in the conspiracy. Such an adjustment is proper "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In determining the number of participants in a criminal activity, the district court must focus upon "the number of *transactional* participants, which can be inferentially calculated provided that the court does not look beyond the offense of conviction to enlarge the class of participants." *United States v. Barbontin*, 907 F.2d 1494, 1498 (5th Cir. 1990). The term "offense," however, "is broader than the offense charged, and includes the `contours of the underlying scheme itself.'" *United States v. Kleinebreil*, 966 F.2d 945, 955 (5th Cir. 1992) (quoting *United States v. Mir*, 919 F.2d 940, 945 (5th Cir. 1990)). Thus, "the scope to be considered . . . encompasses . . . the underlying activities and participants that directly brought about the more limited sphere of the elements of the specific charged offense." *United States v. Manthei*, 913 F.2d 1130, 1136 (5th Cir. 1990). We review the district court's findings on this issue under the clearly erroneous standard. *United States v. Mergeson*, 4 F.3d 337, 347 (5th Cir. 1993).

The record adequately demonstrates that Wilder participated in a criminal activity involving at least five individuals. First, Wilder himself may be counted as a participant. *Barbontin*, 907 F.2d at 1498. Moreover, the record reflects that Kinney,

Glasscock, and Hale also were participants in the underlying criminal scheme. Finally, evidence submitted by Wilder indicates that at least one of his employees prepared the fraudulent letters of credit and was otherwise associated with the counterfeit certificates of deposit and the fraudulent land transfers. Consequently, the criminal scheme in which Wilder was a participant involved at least five individuals.[17]

The record also establishes Wilder's status as a leader or organizer of the scheme. In determining whether a defendant was a leader or organizer, the district court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.3). Here, application of these factors indicates that Wilder organized and managed almost every aspect of the scheme. For example, Wilder enlisted the assistance of Glasscock, Hale, and Kinney in defrauding the two savings and loans and concealing Wilder's participation in transactions through the use of sham land transfers. Moreover, Wilder agreed to release Glasscock and Kinney from liability regarding the G&K land purchase

_____

[17] We also note that the parties stipulated that Wilder's scheme to defraud the two savings and loans caused losses of over five million dollars. *See United States v. Allibhai*, 939 F.2d 244, 252-53 (5th Cir. 1991) (upholding district court's finding that a money laundering scheme was "otherwise extensive" because over one million dollars was involved), *cert. denied*, ___ U.S. ___, 112 S. Ct. 967, 117 L. Ed. 2d 133 (1992).

-18-

transaction and received the bulk of the proceeds and benefits from the fraudulent schemes. The evidence thus amply supports the district court's conclusion that Wilder exercised a leadership role in the criminal scheme.

## VII

Wilder next argues that the district court erred in imposing a four million dollar fine, which was an upward departure from the guideline range.[18] In determining whether to impose a fine, the district court must consider two factors particularly relevant to our inquiry: "any pecuniary loss inflicted upon others as a result of the offense" and "the need to deprive the defendant of illegally obtained gains from the offense." 18 U.S.C. § 3572(a)(3), (4). Moreover, "[i]f any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss . . . ."[19] 18

---

[18] Section 5E1.2 of the guidelines provides a fine range for Wilder's offense level of $10,000 to $100,000.

[19] The guidelines also recognize that upward departures from the fine guideline range are appropriate in certain cases:

> Where . . . two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted.
> Moreover, where a sentence within the applicable fine guideline range would not be sufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged . . . and an adequate punitive fine, an upward departure from the fine guideline range may be warranted.

U.S.C. § 3571(d). Accordingly, Wilder must have derived a gross gain or caused gross losses of at least two million dollars to justify the four million dollar fine.

## A

Although we have recognized the general standards for reviewing departures from the sentencing guidelines, we have not yet addressed the standards for reviewing upward departures from fine guideline ranges. Because the statute governing appellate review of sentences draws no distinction between review of departures from fine or imprisonment ranges, *see* 18 U.S.C.A. § 1372(e)-(f) (West Supp. 1993), the standards we previously have established for review of upward departures from imprisonment ranges are equally applicable to reviewing departures from fine ranges. *See United States v. Graham*, 946 F.2d 19, 21 (4th Cir. 1991) (reaching the same conclusion). Thus, we review the district court's decision to depart from the guidelines for an abuse of discretion. *See United States v. Roberson*, 872 F.2d 597, 601 (5th Cir.), *cert. denied*, 493 U.S. 861, 110 S. Ct. 175, 107 L. Ed. 2d 131 (1989). "A departure from the guidelines will be affirmed if the district court offers `acceptable reasons' for the departure and the departure is `reasonable.'" *United States v. Velasquez-Mercado*, 872 F.2d 632, 635 (5th Cir.), *cert. denied*, 493 U.S. 866, 110 S. Ct. 187, 107 L. Ed. 2d 142 (1989). The reasons articulated by the district court in support of its decision to depart from the

---

U.S.S.G. § 5E1.2, comment. (n.4).

-20-

guidelines constitute findings of fact that we review for clear error. *Id.*

**B**

The district court based its decision to upwardly depart on two grounds: first, that the enhanced fine was necessary to ensure that Wilder disgorged any gain from his criminal activities and, second, that the enhanced fine was permitted by § 3571(d) because Wilder's criminal acts resulted in pecuniary losses to other persons exceeding five million dollars. The district court's findings that Wilder derived at least two million dollars in gross gains and caused at least two million dollars in gross losses is not clearly erroneous. For example, the parties stipulated to the fact that the losses caused by Wilder's scheme exceeded five million dollars. Moreover, the record adequately demonstrates that Wilder received gross profits of over two million dollars from the scheme to defraud. Thus, the district court did not abuse its discretion by upwardly departing from the fine guideline range.

**VIII**

Wilder's last contention is that the government breached the plea agreement by recommending to the district court that it adopt the PSR, which in turn recommended the upward departure regarding Wilder's fine. The government in the plea agreement promised "not to oppose any sentence falling within the guidelines established for" the offenses committed by Wilder. Wilder argues that the prosecutor violated that promise by telling the district court that

the probation office had supplied the court "with an excellent Presentence Report [providing] the Court with great detail about this case . . . , [giving] the Court a good picture of what occurred in this case and . . . fully inform[ing] the Court so that the Court can make the proper decision in this case."

Wilder failed to object to the comments that he now challenges. Consequently, we review his claim for plain error. *United States v. Goldfaden*, 959 F.2d 1324, 1327 (5th Cir. 1992). Plain error

> is error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity or public reputation of judicial proceedings. . . . Alternatively stated, when a new factual or legal issue is stated for the first time on appeal, plain error occurs when our failure to consider the question results in "manifest injustice."

*United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.) (citation omitted), *cert. denied*, ___ U.S. ___, 111 S. Ct. 2032, 114 L. Ed. 2d 117 (1991). The government's breach of a plea agreement can constitute plain error. *Goldfaden*, 959 F.2d at 1328.

The prosecutor's comments do not amount to a breach of the plea agreement. From the context in which the prosecutor made the quoted remarks, it is clear that he was not recommending that the district court depart from the applicable fine guideline range. Rather, the prosecutor was commenting on the usefulness of the PSR's recitation of facts.[20] Additionally, the PSR did not

---

[20] Because Wilder opted to plead guilty instead of going to trial, thereby depriving the district court of the opportunity to

-22-

affirmatively state that the district court should impose a fine greater than the guideline amount,[21] and the issue of departing from the guideline range was not mentioned during sentencing until the district court announced its intent to impose an enhanced fine. *Cf. United States v. Hand*, 913 F.2d 854 (10th Cir. 1990) (no breach where the prosecutor presented no direct evidence in contradiction to agreement).  This case, therefore, is distinguishable from the two cases cited by Wilder to support his claim that the government violated the plea agreement by recommending an upward departure. *See United States v. Canada*, 960 F.2d 263, 269 (1st Cir. 1992) (where the government, after agreeing to recommend that the sentencing court impose a specific sentence, failed to recommend that sentence, urged the judge to impose a lengthy sentence and to send a very strong message); *Goldfaden*, 959 F.2d at 1328 (where the government, in the face of a promise to make no recommendation as to the defendant's sentence, "suggested a base offense level, argued for a minimum offense level . . . , later advanced a higher base offense level . . . , and recommended an upward departure").

---

hear the factual basis for the charges brought by the government, the PSR necessarily needed to provide the sentencing court "with great detail about this case" and give the court "a good picture of what occurred."  Without such information, the sentencing court could not properly impose a sentence.

[21]    The PSR, under the heading "Factors That May Warrant Departure," stated that the amount of the loss caused by the scheme to defraud and the extensive nature of the scheme "support an upward departure for the fine amount."

Accordingly, we find that the government did not breach the plea agreement by commending the PSR to the district court.

**IX**

For the foregoing reasons, we REVERSE the district court's determination that Wilder obstructed justice, VACATE Wilder's sentence, and REMAND for resentencing. On remand, the district court should determine the validity of Wilder's allegations that he rendered substantial assistance pursuant to the terms of the plea agreement and that the government breached that agreement. In all other respects, we AFFIRM the judgment of the district court.