Revised May 2, 2000

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**No. 98-60735**

---

**UNITED STATES OF AMERICA,**

                                              **Plaintiff-Appellee,**

**v.**

**CURTIS GLINSEY,**

                                              **Defendant-Appellant.**

---

**Appeal from the United States District Court for the
Northern District of Mississippi**

---

April 10, 2000

Before REYNALDO G. GARZA, JONES, and EMILIO M. GARZA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

        Curtis Glinsey ("Glinsey"), federal prisoner #10779-042, appeals from the judgment and sentence entered by the district court after Glinsey pled guilty to illegally acquiring and redeeming food stamps as well as attempting to tamper with a witness. Having reviewed the record and briefs, this court finds error only because Glinsey was misinformed by the district court at his guilty plea hearing concerning the possibility and amount of restitution that might be ordered. We reduce the amount of

restitution to $1,000,000, and affirm the district court's judgment as modified.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to the presentence report ("PSR"), federal agents from the United States Department of Agriculture ("USDA") uncovered a possible conspiracy involving the unlawful acquisition and redemption of food stamps by three businesses in Clarksdale, Mississippi: New Eastgate Grocery, Roundyard Grocery, and One-Stop Grocery. Glinsey operated the New Eastgate Grocery and opened the other two businesses under the names of individuals who had no prior dealings with the food stamp program. Derix Dugan ("Dugan") and Rodney Paden ("Paden") reported that they were solicited and paid by Glinsey to sign as the operators of Roundyard Grocery and One-Stop Grocery, respectively. Glinsey also had each person apply for a food-stamp license for his respective store. In each case, Glinsey either owned or leased the property on which the business operated. Dugan testified that Glinsey gave him money for the purpose of illegally purchasing food stamps; Paden claimed that he never worked at One-Stop and went there only to receive cash payments from Glinsey for the use of Paden's name on the business.[1]

---

[1] The government's investigation revealed that various steps were taken to avoid detection. For example, stores with a food-stamp license must be recertified after approximately 10-12 months of operating under the license. In order to pass recertification, a business would have to show that it had purchased and then sold inventory equivalent to the amount of food stamps redeemed. Thus, to avoid a recertification audit, Glinsey would simply shut down one store and open another store under a new name.

In April 1997, USDA agents used undercover operatives to make multiple controlled sales of food stamps to Glinsey and other co-conspirators. On April 8 and 9, Glinsey and Dugan made four separate purchases of food stamps for discounted amounts of cash at New Eastgate Grocery. Other witnesses, who were cashiers at the various stores, corroborated that Glinsey would purchase food stamps illegally and then redeem the stamps through the various businesses.[2]

Sales tax and other records revealed that from June 1995 through May 1997, Glinsey and his co-conspirators illegally redeemed approximately $1,506,128 in food stamps through the three businesses. During this same period, the businesses reported gross sales of only $239,810.94, for a difference of $1,266,317.06. For sentencing purposes, Glinsey was determined to have purchased and redeemed between $800,000 and $1.5 million in food stamps.

As part of their investigation, USDA agents recruited Dugan to testify against Glinsey. After learning that Dugan would assist the government, Glinsey attempted to have Dugan killed. He offered Michael Ratliff ("Ratliff") $10,000 to arrange the murder. Ratliff secretly recorded his conversation with Glinsey and eventually made the tape available to the government.

---

[2] One of the cashiers, Delandra Counsolor, stated that Glinsey told her not to deal directly with food stamp recipients who came into the store to sell their food stamps. She was directed to send the recipient to the back of the store to meet with Glinsey personally. Another cashier, Mary Jenkins, testified that very few food stamps were taken for eligible food items.

Shortly before trial, Glinsey pled guilty to a superseding indictment charging him with conspiracy to acquire and redeem food stamps unlawfully, unlawful acquisitions of food stamps, and unlawful redemption of food stamps. As part of his plea agreement, Glinsey also waived indictment on, and pled guilty to, a one-count information charging him with attempted witness tampering.

Given his participation in the conspiracy, Glinsey's base offense level was 6 under U.S.S.G. § 2F1.1(a). Eleven levels were added because the amount of loss was between $800,000 and $1.5 million. § 2F1.1(b)(1)(L). Two levels were added since the offense involved more than minimal planning. § 2F1.1(b)(2)(A). Four more levels were added for Glinsey's leadership role in the criminal activity, which involved more than five participants or was otherwise extensive. § 3B1.1(a). The probation officer recommended that Glinsey's offense level be increased by two for his obstructive behavior and, in particular, his attempt to have Dugan killed. From the adjusted level of 25 for the food stamp offenses,[3] three levels were subtracted for acceptance of responsibility. Glinsey's final offense level was 22, which, with a category I criminal history, put the imprisonment range at 41 to 51 months.

---

[3] Since the offense level for witness tampering was five levels lower than that for the food stamp violations, the food stamp guidelines applied for sentencing purposes. U.S.S.G. §§ 3D1.2(c), 3D1.3(a).

The district court denied Glinsey's objections to the PSR and sentenced him to 51 months on each count of conviction, with the terms to run concurrently. The district court also ordered restitution in the amount of $1,266,317.06 pursuant to 18 U.S.C. §§ 3563, 3583. No fine was imposed. Glinsey timely appealed the effectiveness of his counsel, the imposition of restitution, the manner in which his offense level was calculated, and the voluntariness of his plea.

## II. ANALYSIS

Glinsey argues that he should be allowed to withdraw his guilty plea for several reasons: (1) his counsel was ineffective, (2) the district court violated Rule 11 by ordering restitution without informing him that restitution was possible, (3) his sentence was improperly enhanced since he was not a leader in a conspiracy, and (4) his plea was involuntary. Although issues (1), (2) and (4) overlap, we review each issue in turn.[4]

1. Ineffective assistance of counsel

Glinsey raises his ineffective assistance of counsel claim for the first time on appeal. Glinsey contends that his attorneys were ineffective for two reasons: (1) failing to move to suppress an audio tape implicating Glinsey in an attempt to have

---

[4] We review questions of law de novo. United States v. Rico, 51 F.3d 495, 500 (5th Cir. 1995). The district court's factual findings are reviewed for clear error. United States v. Howard, 106 F.3d 70, 73 (5th Cir 1997). Since Glinsey is proceeding on appeal pro se, this court must construe his claims liberally rather than holding him to the standards expected of lawyers. See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 595 (1972).

5

Dugan murdered, and (2) failing to investigate different methods of calculating loss used in other food stamp cases.[5]

A voluntary guilty plea waives all nonjurisdictional defects in the proceedings against the defendant. United State v. Smallwood, 920 F.2d 1231, 1240 (5th Cir. 1991). This includes claims of ineffective assistance of counsel except insofar as the ineffectiveness is alleged to have rendered the guilty plea involuntary. Unsurprisingly, Glinsey asserts exactly this connection between counsel's alleged errors and his guilty plea. And although we ordinarily review a claim of ineffective assistance raised on direct appeal "only in rare cases where the record allowed us to evaluate fairly the merits of the claim," United States v. Higdon, 832 F.2d 312, 314 (5th Cir. 1987), this is such a rare case, since the record clearly belies Glinsey's claims.

In order to establish ineffective assistance of counsel, Glinsey must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 689-94, 104 S.Ct. 2052, 2065-68 (1984). With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill v.

---

[5]    Glinsey also argues that his counsel was ineffective for not informing the district court of a proposed amendment to the sentencing guidelines. Since sentencing courts must apply the guidelines in effect at the time of sentencing, 18 U.S.C. § 3553(a)(4)(A), Glinsey's claim is without merit.

6

Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370 (1985). Thus, Glinsey "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id.

a. Motion to suppress the audio tape

Glinsey avers that his counsel was ineffective for failing to move to suppress the audio tape in which Glinsey was caught trying to arrange the murder of Dugan. Glinsey contends that the tape was inadmissible under Title III of the Omnibus Crime and Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(2)(d), since Ratliff made the tape for the purpose of extorting money.

At the time Glinsey entered into the plea agreement, the food stamp trial was roughly two weeks away. Although the attempted witness tampering had already occurred and Glinsey's bond had been revoked partly for that reason,[6] no charge of attempted witness tampering had yet been filed. Since a motion to suppress the tape would have been premature as to a witness tampering charge, and the tape was irrelevant to the food stamp crimes, Glinsey's counsel had no forum and no opportunity to move to suppress. Counsel was not ineffective for failing to move to suppress.

Furthermore, Glinsey does not show that he was prejudiced by his attorney's omission. A transcript of the tape was offered

---

[6] The court also based revocation of the bond on Glinsey's possession of a firearm.

7

at the bond revocation hearing, where Ratliff (who had made the tape) testified under oath to the events surrounding Glinsey's attempt to have Dugan murdered, including the recorded conversation. Glinsey does not claim, nor does the record support, that his attorney was deficient in not objecting to this testimony. The merely cumulative transcript of the tape recording was not constitutionally prejudicial to Glinsey.

b.    Failure to investigate loss calculation

Glinsey also contends that his counsel was ineffective for failing to investigate cases that would show that the district court overstated its loss calculation. To establish his failure to investigate claim, Glinsey must allege with specificity what the investigation would have revealed and how it would have benefitted him. United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989). He must also show a reasonable probability that, but for counsel's unprofessional errors, the sentence would have been significantly less harsh. Spriggs v. Collins, 993 F.2d 85, 88 (5th Cir. 1993).

Glinsey fails to make this showing for two reasons. First, a district court's loss determination under § 2F1.1(b)(1) is a factual finding reviewed for clear error. United States v. Oates, 122 F.3d 222, 225 (5th Cir. 1997). The loss calculation need not be precise and will be affirmed so long as it reasonably estimates the loss using reasonably available information. See § 2F1.1, cmt. n.8. Accordingly, "the court can adopt facts contained

in a PSR without inquiry, if those facts had an adequate evidentiary basis and the defendant does not present rebuttal evidence." United States v. Puig-Infante, 19 F.3d 929, 943 (5th Cir. 1994). If no relevant affidavits or other evidence is submitted to rebut the information in the PSR, the district court is free to adopt the PSR findings without further inquiry or explanation. United States v. Mir, 919 F.2d 940, 943 (5th Cir. 1990). The defendant bears the burden of demonstrating that the information in the PSR is materially untrue. United States v. Rodriguez, 897 F.2d 1324, 1328 (5th Cir. 1990). Glinsey has not carried this burden.

The district court calculated Glinsey's loss based on the total amount of food stamps redeemed ($1,506,128) less the reported gross sales ($239,810.94), for a total of $1,266,317.06. Glinsey's offense level was increased by eleven because the loss was found to be between $800,000 and $1.5 million. § 2F1.1(2)(A). Glinsey does not dispute the finding that he illegally purchased and redeemed over $1.2 million in food stamps. At the hearing, his counsel argued that the amount of money paid by Glinsey to purchase the food stamps, typically 70-80 percent of the value of the stamps, should have been subtracted from the face value of the food stamps to arrive at the total loss.

But no other evidence was offered to support this contention. The cases Glinsey cites do not show that the district

9

court's reliance on the actual amount of food stamps purchased and redeemed is unreasonable. This court has rejected the argument that restitution is limited to the amount of profit made in the illegal food stamp fraud scheme. See United States v. Lewis, 104 F.3d 690 (5th Cir. 1996). *Lewis* held that the amount of restitution should be the full face value of the food stamps for which the defendant illegally obtained cash redemptions from the USDA. Id. at 692-93. As this is the amount used by the district court, there was no error.

Second, the cases cited by Glinsey do not support his assertion that the district court's loss calculation was erroneous. In fact, in two of the cases he cites, the courts determined the loss based on the face value of the food stamps that were illegally obtained and redeemed, which was the method used by the district court in this case.[7]

Neither branch of Glinsey's ineffectiveness claim is sustainable.

2. Appropriateness of ordering restitution

Glinsey argues that the district court erred in ordering restitution since neither the plea agreement nor the rearraignment colloquy mentioned the possibility of restitution, though he was told he could face a fine of up to $1 million.

---

[7] See United States v. Cheng, 96 F.3d 654, 656-57 (2d Cir. 1996); United States v. Barnes, 117 F.3d 328, 334-35 (7th Cir. 1997).

Under 18 U.S.C. § 3663(a)(1)(A), a sentencing court may order restitution if, as in the present case, a loss was sustained by the victim as a result of an offense. The court's authority exists notwithstanding the lack of an agreement between the prosecution and defense on restitution. Compare 18 U.S.C. § 3663(a)(3).

To confirm the voluntariness of a guilty plea, Rule 11 requires, among other things, that the district court "address the defendant personally in open court and inform the defendant ..., when applicable, that the court may also order the defendant to make restitution to any victim of the offense." Fed. R. Crim. P. 11(c)(1). In reviewing whether the district court complied with Rule 11, this court "conduct[s] a straightforward, two-question 'harmless error' analysis: (1) Did the sentencing court in fact vary from the procedures required by Rule 11, and (2) if so, did such variance affect substantial rights of the defendant?" United States v. Johnson, 1 F.3d 296, 298 (5th Cir. 1993)(en banc); see also Fed. R. Crim. P. 11(h) This court's inquiry may include reviewing the written plea agreement, the transcript of the sentencing hearing, and the sentence actually imposed. Johnson, 1 F.3d at 298. A "substantial right" is violated if "the defendant's knowledge and comprehension of the full and correct information

11

would have been likely to affect his willingness to plead guilty." Id. at 302.[8]

Glinsey was not informed of the possibility of paying restitution in the plea agreement or at the rearraignment colloquy. Thus, the district court unfortunately varied from the procedures required by Rule 11. However, this is only one prong of the *Johnson* analysis. Glinsey must also show that the district court's variance affected his substantial rights.

Toward this end, Glinsey relies on *United States v. Corn* (a pre-*Johnson* case) to argue that the district court's ordering restitution without prior notice affected his substantial rights. 836 F.2d 889 (5th Cir. 1988). In *Corn*, after pleading guilty to contempt, the defendant was ordered to pay over $6 million in restitution. The defendant received no notice at the guilty plea hearing that restitution might be ordered. Id. at 895. This court reversed the district court because "the imposition of a restitution order in so large an amount, without explicit prior notice of the possibility of restitution, could scarcely be deemed either harmless or not to affect the defendant's substantial rights." Id. at 895. On remand, the district court was instructed

---

[8] Although Glinsey failed to raise his Rule 11 claim below, according to our caselaw, we do not review it for plain error. See United States v. Reyna, 130 F.3d 104, 107 n.2 (5th Cir. 1997); United States v. Still, 102 F.3d 118, 122 n.9 (5th Cir. 1996), cert. denied, 522 U.S. 806, 118 S.Ct. 43 (1997). But compare United States v. Ulloa, 94 F.3d 949, 955 (5th Cir. 1996) (opinion of one judge).

to sentence the defendant without imposing restitution or to allow the defendant to withdraw his guilty plea.[9]

Unlike *Corn*, where the defendant knew only that he faced some fine or other, Glinsey pled guilty after the court's warning that he could be fined up to $1 million. But, in lieu of the maximum fine, the district court imposed restitution in the amount of $1,266,317.06.[10] Thus, under *Johnson*, the question is whether Glinsey's knowing about the roughly $266,000 difference (between the amount of the possible fine he was informed of and the restitution actually ordered) would have affected his willingness to plead guilty.

Even assuming that the roughly $266,000 difference might have affected his decision to plead guilty, the judgment need not be vacated. We may reduce the order of restitution to $1 million, an amount that does not infringe his substantial rights. Glinsey is not prejudiced so long as his liability does not exceed the maximum amount that the court informed him could be imposed as a fine. It is the amount of liability, rather than the label 'restitution,' that affects Glinsey's substantial rights. "Whether

---

[9] See also United States v. Showerman, 68 F.3d 1524, 1528 (2d Cir. 1995)(holding that the failure to mention the possibility of restitution at the Rule 11 hearing is not harmless error even if the restitution imposed is less than the maximum fine the defendant understood he might receive). The Second Circuit's analysis constitutes the minority position on this issue.

[10] After ordering restitution, the district court stated that "[N]o fine is being ordered due to the defendant's inability to pay, and the -- or order here concerning restitution." A fair reading of this quote in context shows that the district court felt Glinsey would not be able to pay a fine above and beyond the restitution order. Thus, only restitution was ordered.

13

the amount to be paid is classed as restitution or a fine ordinarily makes little difference in its bite, and warning of one but not the other does not require collateral relief." United States v. Stumpf, 900 F.2d 842, 845 (5th Cir. 1990). Although *Stumpf* concerned collateral (as opposed to direct) relief, the reasoning is the same in the present case. Under the modified judgment, Glinsey is obliged to pay no more than he was warned of at the time of his guilty plea. This modification reconciles the court's failure to advise Glinsey of restitution with its offsetting warning of his exposure to a fine.

In so holding, this court follows the approach adopted by the First Circuit in United States v. Padin-Torres, 988 F.2d 280, 283-85 (1st Cir. 1993)(reducing the restitution order to the maximum fine amount which the defendant was warned about at his plea hearing). This approach is also consistent with similar decisions of six other circuits.[11]

Moreover, Glinsey has not suggested why having to pay restitution of $ 1 million as opposed to a fine of $1 million would "affect his willingness to plead guilty." Johnson, 1 F.3d at 302. Nor do we find any reason in the record. Although restitution was not mentioned in the plea agreement or at the hearing, Glinsey

---

[11] See United States v. McCarty, 99 F.3d 383, 386 (11th Cir. 1996); United States v. Gabriele, 24 F.3d 68, 70-71 (10th Cir. 1994); United States v. Fox, 941 F.2d 480, 484 (7th Cir. 1991); United States v. Crawford, 169 F.3d 590, 592 (9th Cir. 1999); United States v. Miller, 900 F.2d 919, 921 (6th Cir. 1990); United States v. Fentress, 792 F.2d 461, 465-66 (4th Cir. 1986).

stipulated that he participated in a conspiracy exceeding $1 million, and he was aware that restitution might be imposed. The presentence report stated that "restitution may be ordered in this case ... in the amount of $1,266,317.06 ..." and that "[i]n accordance with the provisions of U.S.S.G. Section 5E1.1, restitution shall be ordered." ¶¶ 100, 101. Glinsey and his attorney both certified that they had read the report, and neither objected to the possibility of having to pay restitution. In contrast, Glinsey vigorously challenged the amount of restitution. These facts reinforce our conclusion that Glinsey's having to pay restitution in the amount of $1 million, instead of a fine, would not have affected his willingness to plead guilty so long as his total liability does not exceed the maximum fine that could have been imposed.

This court, therefore, modifies the restitution amount to $1 million.

3. Glinsey's leadership role in the conspiracy

Glinsey contends that the district court erred in adjusting his sentencing level upward for his leadership role in the offense under U.S.S.G. § 3B1.1(a).[12] Glinsey avers that the evidence was insufficient to show that five participants were involved or that the food stamp scheme was otherwise extensive. In

---

[12]    Glinsey also argues that the district court erred in enhancing his offense level for obstruction of justice and more than minimal planning. Glinsey did not raise the objection below, so this court reviews for plain error. United States v. Navejar, 963 F.2d 732, 734 (5th Cir. 1992). None exists.

particular, Glinsey challenges the district court's finding that the store cashiers, Jenkins and Counsolor, were participants.

This court reviews a district court's factual determinations in sentencing under no less generous a standard than that of clear error. United States v. Ronning, 47 F.3d 710, 711 (5th Cir. 1995). In determining whether the defendant had a leadership (as opposed to a supervisory) role, the sentencing court should consider the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n.4. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id., cmt. n.1.[13] All that is required is that the person participate knowingly in some part of the criminal enterprise. United States v. Boutte, 13 F.3d 855, 860 (5th Cir. 1994). In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1, cmt. n.3. "Thus, a fraud that involved only three participants but used

---

[13] "Offense" refers to the contours of the underlying scheme, which is broader than the offense charged. United States v. Wilder, 15 F.3d 1292, 1299 (5th Cir. 1994).

16

the unknowing services of many outsiders could be considered extensive." Id.

Even if Counsolor and Jenkins were not participants, Glinsey still directed an "otherwise extensive" scheme to illegally purchase and redeem food stamps. Paden, Dugan, Counsolor, and Jenkins all testified that Glinsey was the leader of the food stamp operation and that he merely paid the others for the use of their names or for their assistance. As a result of this operation, Glinsey kept most of the enormous profits for himself. In light of the record as a whole, Glinsey was involved in an "otherwise extensive" scheme to defraud the government, and the district court did not clearly err in adjusting Glinsey's base level upward.[14]

4.  The voluntariness of Glinsey's plea

Glinsey contends that his guilty plea was not knowingly, voluntarily, and intelligently entered because his plea agreement did not state that restitution would be imposed; his counsel did not investigate authorities dealing with loss calculation; and his counsel failed to investigate a statutorily and factually supported defense that would have prohibited the introduction of an illegally obtained, inculpatory audio tape. As a result, Glinsey argues that he should be allowed to withdraw his guilty plea.

---

[14]    This holding is consistent with Barnes, 117 F.3d at 336-38, in which the Seventh Circuit upheld the leadership adjustment where the defendant had organized and led an extensive food stamp scheme among his employees, exchanged food stamps for cash with USDA undercover agents, and purchased food stamps with his own money.

17

In general, "[t]here is no absolute right to withdraw a guilty plea." United States v. Grant, 117 F.3d 788, 789 (5th Cir. 1997). Prior to sentencing, "the court may permit the plea to be withdrawn if the defendant shows any fair and just reason." Fed. R. Crim. P. 32(e). But "the standard for withdrawal of a guilty plea after sentencing is considerably more stringent. A defendant seeking to withdraw a plea of guilty at the post-sentencing stage is obligated to show 'a fundamental defect which inherently results in a complete miscarriage of justice' or 'an omission inconsistent with the demands of fair procedure.'" United States v. Hoskins, 910 F.2d 309, 311 (5th Cir. 1990)(quoting Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 471 (1962)).

The stringent test for overcoming a guilty plea after sentencing is not satisfied here. Glinsey has not asserted his innocence and has delayed in moving to withdraw his plea. He was represented by counsel at every stage of the proceedings in the district court. The district court accepted his guilty pleas only after addressing Glinsey personally in open court pursuant to Rule 11 and determining that he had reviewed the plea agreement completely and was voluntarily entering his plea. These facts suggest that Glinsey is not even entitled to withdraw his plea

18

under Rule 32(e) yet alone the additional standards for withdrawing a plea post sentencing.[15]

Glinsey faces an additional problem.  He claims that his plea was involuntary because his counsel was ineffective and the district court failed to warn him that restitution might be imposed.  We have rejected these contentions and modified the restitution order consistent with Glinsey's understanding of his monetary exposure.  The plea cannot have been involuntary because of non-existent or immaterial errors.

The contemporaneous court record shows that Glinsey voluntarily, knowingly, and intelligently entered his guilty plea. At some point, Glinsey changed his mind about his plea, but "a mere change of mind is insufficient to permit the withdrawal of a guilty plea before sentencing, much less after sentencing."  United States v. Hoskins, 910 F.2d 309, 311 (5th Cir. 1990).[16]

---

[15] Under the more lenient standard of Rule 32(e), the district court considers seven factors: "(1) the defendant has asserted his innocence; (2) withdrawal will prejudice the government; (3) the defendant delayed in filing his withdrawal motion; (4) withdrawal would substantially inconvenience the Court; (5) close assistance of counsel was available to the defendant; (6) the plea was knowing and voluntary; and (7) withdrawal would waste judicial resources." United States v. Brewster, 137 F.3d 853, 857 (5th Cir. 1998)(citation omitted).

[16] See United States v. Hyde, 520 U.S. 670, 677, 117 S.Ct. 1630, 1634 (1997): "Were withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim.  In fact, however, a guilty plea is no such trifle, but a 'grave and solemn act,' which is 'accepted only with care and discernment.'" (citations omitted).

19

### III. CONCLUSION

For these reasons, Glinsey's judgment of conviction is affirmed, and his restitution award is modified to $1 million.

**AFFIRMED AS MODIFIED.**