IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-51173

_____

UNITED STATES OF AMERICA,     Plaintiff - Appellee,

versus

TONY DAVIS,     Defendant - Appellant.

_____

Appeal from the United States District Court for the
Western District of Texas
_____

August 29, 2000

Before POLITZ, GIBSON,[*] and HIGGINBOTHAM, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Tony Davis was convicted of one count of conspiracy, 18 U.S.C. § 371 (1994), two counts of wire fraud, 18 U.S.C. § 1343 (1994), two counts of travel and transportation of securities for fraudulent purposes, 18 U.S.C. § 2314 (1994), and three counts of money laundering, 18 U.S.C. § 1957 (1994), all in connection with his operation of an advance-fee scheme, in which he would agree to obtain funding for clients, but would never do so. Davis was sentenced to 60 months imprisonment on each of the first three counts and 97 months on each of the last five counts, to run concurrently, and assessed $3,609,937.79 in restitution. On

---

[*]United States Circuit Judge for the Eighth Circuit, sitting by designation.

appeal, he contends that the district court erred in failing to suppress wrongfully seized evidence, in failing to dismiss the case as a sanction for violation of Davis's attorney-client privilege, in failing to dismiss the indictment, in instructing the jury, and in sentencing him. He also argues that the evidence was insufficient to support the conspiracy and money-laundering counts. We affirm the judgment and sentence imposed.

At trial the government presented testimony of fifteen clients who came to Davis seeking venture capital for business projects. In each case the story followed the same lines. Davis would state that he had the present ability to fund such projects and that the clients would get their funding within a certain time, usually from 30 to 120 days, of paying an advance fee. Davis would promise to refund the fees if he could not provide funding. Davis would then collect fees from the clients, typically between $25,000 and $150,000. Davis never provided the funding as promised, but tantalized the clients with endless representations that their funding was just around the corner. Davis rarely refunded the fees, although he paid some money back to two clients, in one case in response to a lawsuit. From the fifteen clients who presented their stories at trial, Davis took in almost $2 million in fees.

Davis told his clients he had access to valuable financial instruments, such as a guarantee for $100 million from the Industrial Bank of Kibris, Ltd., and certificates of deposit worth $50 million from CariBank International. Davis had obtained the Kibris guarantee and other such instruments without paying anything

for them.  He had also received a report from an investigator he retained stating that the instruments were worthless.

Davis was assisted in his scheme by Thomas Chaffe, who provided false references to borrowers by claiming that Davis had funded a $25 million project for him.  Chaffe was tried as a co-defendant on the conspiracy count and on one count of interstate travel for fraudulent purpose.  He was acquitted on both counts.

Also involved was Louis Lopez, who worked in the business with Davis.  Lopez posed as an escrow agent, thus enabling Davis to get an additional $300,000 out of a client who balked at sending more money to Davis himself.  Lopez was not an escrow agent, and Davis appropriated the $300,000 "escrow" payment.  Lopez entered a plea bargain, pleading guilty to a single misdemeanor count of filing a false income tax return.

## I.

Davis argues that the district court erred in denying his motion to suppress evidence seized from his home and office in a search conducted pursuant to a search warrant.  Davis objects (1) that the FBI officer who applied for the warrant omitted information from his affidavit that made the affidavit misleading to the magistrate; (2) that the warrant was not adequately particular; (3) that the warrant was overbroad; and (4) that the magistrate relied on oral statements that were not recorded.

On October 7, 1994, the FBI searched Davis's home and office under search warrants that listed fifteen categories of evidence to be seized, mostly various kinds of financial records, both paper

and electronic. The warrant was based upon the affidavit of FBI agent Emil Parelli. Parelli stated that he had reason to believe the Davis house and office contained evidence of wire fraud based on his knowledge of facts about two would-be borrowers, the Goldtaper group, represented by Geoffrey Burchill and Timothy Wright, and Spacelink Airborne Systems, represented by general partner Michael Kelly.

Parelli's affidavit recounted that Wright and Burchill came to Davis, who was doing business as Forum Financial, in search of $116 million to fund two projects in Australia for the Goldtaper group. Davis told them he had sufficient securities on hand to convert to cash and fund Goldtaper's project. Burchill, Wright, and Davis signed a formal commitment letter on July 21, 1993 stating that Goldtaper would receive $15 million in funding within 120 days. Goldtaper paid Davis a $120,000 fee for providing the funding. The 120-day period expired in November 1993, but Davis did not provide the $15 million. Davis then faxed a statement to Burchill stating that Davis had $250 million in financial instruments and letters of credit; on the strength of this representation, Wright granted Davis a thirty-day extension, but Davis did not fund the project at the end of the extension. In December 1993 and January 1994, Davis told Burchill and Wright that he had borrowed the securities necessary to obtain a loan and would be able to fund Goldtaper in January 1994, but Davis never came through with the funds. Burchill made formal demand of Davis to return Goldtaper's $120,000

fee as required by the commitment letter, but Parelli's affidavit stated: "Davis did not return the fee as promised."

Parelli's affidavit also recounted the similar story of Spacelink Airborne Systems, which dealt with Davis through general partner Michael Kelly. Kelly sought $100 million in funding through Davis. Kelly and Davis signed a formal commitment letter on April 26, 1994, in which Davis promised to provide Spacelink $1 million by June 10, 1994. Kelly paid Davis $125,000 to provide this funding. Davis did not provide Spacelink any money by June 10, 1994, or by the subsequently promised dates of June 15, 1994, July 8, 1994, July 18, 1994, and July 21, 1994. Davis never funded the project. Davis provided the name of Thomas Chaffe as someone whom he had provided financing. Kelly telephoned Chaffe, who told him that he had received $25 million in funding from Davis. The next day a cooperating witness spoke to Chaffe, who told the witness that he had not received $25 million from Davis. Parelli stated that Kelly formally demanded return of his $125,000 fee, but Davis did not refund it.

The affidavit further stated that bank records revealed hundreds of thousands of dollars had come into the accounts of Davis's firm, Economic Dutch Consultants, U.S.A., Inc., doing business as Forum Financial, but that no tax returns had been filed for that company for the years 1990-1993.

Parelli presented this affidavit to the magistrate. In examining it, the magistrate asked Parelli whether there were other

victims besides Goldtaper and Spacelink, and Parelli answered that there were. This colloquy was not recorded.

The magistrate issued the warrants authorizing seizure of fifteen categories of evidence, primarily financial records of Forum Financial and of Davis and his wife, Gaylan. Parelli testified that the FBI seized 65 boxes of documents in the search.

Davis moved to suppress the evidence seized in the search. After a hearing, the court denied Davis's motion.

## A.

In reviewing the district court's ruling on a motion to suppress evidence, we review factual findings for clear error. See United States v. Cherna, 184 F.3d 403, 406 (5th Cir. 1999), cert. denied, 120 S. Ct. 1669 (2000). We review de novo legal conclusions regarding the constitutionality of law enforcement action, the sufficiency of the warrant, and the reasonableness of an officer's reliance on a warrant. See id. at 406-07.

In considering a Fourth Amendment challenge to a seizure conducted pursuant to a search warrant, we ask first whether the seizure falls within the good-faith exception to the exclusionary rule. See id. at 407 (citing United States v. Leon, 468 U.S. 897 (1984)). Under the good-faith exception, "evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible in the prosecution's case-in-chief, even though the affidavit on which the warrant was based was insufficient to establish probable cause." United States v. Shugart, 117 F.3d 838, 843 (5th Cir. 1997) (quotation omitted).

-6-

Only if we conclude that the good-faith exception does not apply do we proceed to ask whether the magistrate who issued the warrant had a substantial basis for believing there was probable cause for the search. See Cherna, 184 F.3d at 407.

(1)

Davis argues that the Leon exception does not apply to his case[1] because Parelli misled the magistrate by omitting information in his possession that would have weakened the case against him. To impeach the warrant, Davis must show that Parelli either deliberately or recklessly misled the magistrate and that without the falsehood there would not be sufficient matter in the affidavit to support the issuance of the warrant. See Franks v. Delaware, 438 U.S. 154, 171-72 (1978). The necessary falsehood can be perpetrated by omission as well as commission, but the omission must be of information that is not only relevant, but dispositive, so that if the omitted fact were included, there would not be probable cause. See United States v. Bankston, 182 F.3d 296, 305

---

[1]There are four situations in which the Leon good-faith exception does not apply. First, the good-faith exception does not apply when the magistrate issuing the warrant was intentionally or recklessly misled by the affiant on whom he relied. See Cherna, 184 F.3d at 407. Second, the exception does not apply if the magistrate "wholly abandoned his judicial role" and acted as a part of the law enforcement team, rather than as a check on its zeal. Id. at 407-08 (citing Lo-Ji Sales, Inc. v. New York, 442 U.S. 319 (1979)). Third, the exception is not available if the warrant was based on an affidavit "so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable." Leon, 468 U.S. at 923 (quotations omitted). Finally, the warrant itself could be so facially deficient, for instance, so lacking in particularity, that an officer would be unreasonable to rely on it. See id.

(5th Cir. 1999), <u>cert. granted on other grounds</u>, 120 S. Ct. 1416 (March 20, 2000) (No. 99-804); <u>United States v. Tomblin</u>, 46 F.3d 1369, 1377 (5th Cir. 1995).

Davis claims that Parelli omitted details of the Goldtaper and Spacelink funding agreements that would have shown that Davis had retained the legal right not to perform, specifically, that the Spacelink agreement excused Davis from performing if Spacelink became insolvent and that, in paying Davis the $125,000 fee, Spacelink rendered itself insolvent. Thus, he contends, Spacelink was not entitled either to get its $125,000 back or to have Davis perform his part of the agreement.

Without going into the obvious difficulties with this argument, we need only say that the evidence at the suppression hearing showed Spacelink was not insolvent and has never been, despite its loss from dealing with Davis.

Davis also contends that Parelli concealed that Davis had refunded $60,000 to Goldtaper. Parelli testified that he did not include this fact because the money was not paid to Goldtaper as promised, in whole on demand, but rather in $20,000 increments in attempts to stave off a lawsuit. Although Davis's partial repayment is relevant, it is not dispositive. Parelli's affidavit shows that Davis did more than simply fail to pay a contractual commitment. According to the affidavit, Davis repeatedly told Goldtaper's principals that he already had sufficient securities on hand to fund their project. Davis also led them to believe he had funded another project that he did not really fund. Thus, there

was reason to believe Davis had already committed fraud, and partial settlement of the claim against him under duress does not take away the probable cause established by the other parts of the affidavit.

Davis's other attacks on the affidavit also fail. Our review of the record shows, even with the evidence Davis advances, that the Parelli affidavit provided probable cause to believe Davis had committed fraud and that the claimed omissions do not tend to exculpate Davis.

(2)

Davis also argues that the Leon good-faith rule does not apply because the affidavit does not provide probable cause for a search of the breadth authorized by the warrant. A warrant based on a "bare bones" affidavit that is obviously insufficient to establish probable cause does not justify an officer's reliance. See Cherna, 184 F.3d at 410. Even though the warrant did authorize seizure of broad categories of financial documents, that breadth was supported by the affidavit, which suggested Davis's business was nothing but a confidence scheme. See id. at 409-10; United States v. Humphrey, 104 F.3d 65, 68-69 (5th Cir. 1997) (all-records search of home and business valid because affidavit supported conclusion that entire business was merely a scheme to defraud and defendant's personal and business lives overlapped). There certainly was not the kind of discrepancy between the assertions in the affidavit and the scope of the warrant that would make it unreasonable for an officer to rely on the warrant. See Cherna, 184 F.3d at 409-10.

(3)

Davis also contends that the <u>Leon</u> exception does not apply because the warrant lacked the particularity required by the Fourth Amendment. Although parts of the warrant described generic categories of documents, rather than specific documents, the fifteen categories of evidence described in the warrant are delineated in as much detail as is practicable for investigating the kind of fraud indicated in this case. We have held that warrants using generic categories of evidence are adequately particular where the crime being investigated is likely to require examination of all of a business's records. <u>See</u> <u>Humphrey</u>, 104 F.3d at 69. The affidavit indicated that there was reason to believe that Forum Financial had failed to file required tax returns; proof that Forum had made money on which it owed taxes would require review of broad categories of Forum's records. Further, the warrant in this case shows that the officers made some attempt to narrow the categories of evidence as much as possible. For example, the warrant limited the documents to be seized by date or subject matter in many cases. The warrant is more particular than, for instance, the one we approved in <u>Humphrey</u>, 104 F.3d at 68-69 n.1. It was therefore not so defective that an officer would be unreasonable to rely on it. <u>See</u> <u>Cherna</u>, 184 F.3d at 411-12.

(4)

Davis also argues that the officers were not entitled to rely on the warrant because the magistrate asked Parelli questions, but failed to have his answers recorded. Parelli testified at the

-10-

suppression hearing that the magistrate to whom he applied for the warrant asked him if there were other victims in addition to Spacelink and Goldtaper. He told the magistrate there were. Federal Rule of Criminal Procedure 41(c)(1) requires that if the magistrate supplements the written affidavit with oral testimony, the testimony should be recorded. However, where, as here, the written affidavit was adequate to support issuance of the warrant, the warrant will not be invalidated merely because the magistrate elicited statements that were not recorded. See United States v. Massey, 687 F.2d 1348, 1356 (10th Cir. 1982); United States v. Sturgeon, 501 F.2d 1270, 1274 (8th Cir. 1974).

II.

Davis contends that the district court should have dismissed the case because the seizure of documents protected by the attorney-client privilege violated his Sixth Amendment rights. Davis also contends that the court should have suppressed evidence because of the violation of his attorney-client privilege. The documents subject to privilege were submitted to a magistrate, who ordered them sequestered, and they were not introduced at trial.

Even assuming that the government intruded on Davis's attorney-client privilege by initially seizing the documents, we would not dismiss the case against Davis without some showing of prejudice. See United States v. Morrison, 449 U.S. 361, 365-66 (1981). The government did not offer any privileged documents into evidence at trial because they were all under seal. Davis does not

-11-

point to even one document that he contends would have revealed his trial strategy or harmed him in any other articulable way. Davis has failed to put forward the slightest showing of prejudice, and so we can only affirm the district court's denial of his motion to dismiss.

III.

Davis asserts that the district court erred in refusing to dismiss the superseding indictment because it alleged that the conspiracy continued through the date of that indictment, November 18, 1997, even though Davis and his co-defendants had been arrested in November 1996 in connection with the original indictment. According to Davis, the arrest terminated the conspiracy as a matter of law. The district court denied Davis's motion to dismiss, holding that the government could indict Davis for further criminal acts intervening between his first arrest and the filing of the superseding indictment. We review de novo the district court's ruling on the sufficiency of the indictment. See United States v. Cabrera-Teran,168 F.3d 141, 143 (5th Cir. 1999).

Davis appears to concede that the government adduced evidence of acts after the date of the arrest that would have been in furtherance of the conspiracy, had the conspiracy not ended as a matter of law on the date of the arrest. He contends, however, that the continuation of the scheme after the date of arrest of all the conspirators cannot as a matter of law be a continuation of the "conspiracy" and that he was injured by the introduction of evidence of acts committed after the magic date.

-12-

This belabored, technical argument finds no support in our precedent or in common sense. The statement in our cases that a person's participation in a conspiracy ends with his arrest has its origin in the co-conspirator hearsay cases and is a general rule used in determining when statements are made in furtherance of a conspiracy. See, e.g., United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993) (ordinarily, a person's participation in a conspiracy ends with arrest). Where there is evidence that conspirators managed to continue conducting the business of the conspiracy after arrest, the mere fact of arrest does not prevent the government from relying on that evidence. See United States v. Register, 496 F.2d 1072, 1078-79 (5th Cir. 1974); see also United States v. Puig-Infante, 19 F.3d 929, 945 (5th Cir. 1994) (arrest does not constitute automatic withdrawal from conspiracy); United States v. Howard, 115 F.3d 1151, 1156-57 (4th Cir. 1997). Here, Davis was out on bond and conducting business as usual, including telling one victim as recently as a month before trial that he was going to provide him funding. Alleging that the conspiracy continued after the arrest of the conspirators does not amount to a defect in the indictment.

IV.

Davis argues that the evidence is insufficient to convict him of conspiracy under Count 1 or of money laundering under Counts 9, 10, and 11. Our review of the sufficiency of the evidence supporting a conviction is narrow: we will affirm if a rational trier of fact could have found that the evidence established the

-13-

essential elements of the crime beyond a reasonable doubt.  See United States v. Westbrook, 119 F.3d 1176, 1189 (5th Cir. 1997). We view the evidence in the light most favorable to the verdict. See United States v. Moreno, 185 F.3d 465, 471 (5th Cir. 1999), cert. denied, 120 S. Ct. 835 (2000).  While the jury is free to choose among reasonable constructions of the evidence, a verdict cannot be affirmed if it is based on circumstantial evidence that is as consistent with innocence as with guilt.  See id.

A.

Count 1 charged Davis with conspiracy to commit wire fraud, 18 U.S.C. § 1343, and inducement of travel or transport of securities in interstate commerce for fraudulent purpose, 18 U.S.C. § 2314. To prove conspiracy, the government must prove beyond a reasonable doubt that there was an agreement to violate the law and that each conspirator knew of the conspiracy, intended to join it, and participated in it voluntarily.  See Westbrook, 119 F.3d at 1189. A conspirator need not know all the details of the unlawful enterprise, so long as he knowingly participates in some way in the larger objectives of the conspiracy.  See id.

Count 1 charged Davis, Lopez, and Chaffe as co-conspirators. On appeal, the government does not argue that it proved Chaffe participated in the conspiracy, but it does contend that it proved Lopez and Davis conspired to use interstate wire communications to defraud Tonia Yeh, who lived in California, of $300,000 that she sent to Austin Escrow Services in Texas.

-14-

Yeh represented C&C Gateway, Inc., which wanted to borrow $3.8 million to build a steel plant in China. Davis provided Yeh with promotional materials indicating Forum Financial had the ability to fund the projects, and he told her he could provide the $3.8 million within thirty days after they signed a contract. When Davis sent her a fax stating that the initial funding could be done within thirty days, Yeh wired Davis a $50,000 fee on January 17, 1995 and signed a contract. Later, Davis faxed Yeh another memo stating that Forum would refund any retainers paid to it if it did not provide complete funding for C&C Gateway's project. Consequently, Yeh wired another $50,000 to Forum.

Instead of providing the $3.8 million, Davis next told Yeh that she must put up $300,000 as a security deposit. Initially, Davis proposed that the security deposit be paid directly to him, but Yeh insisted that the deposit be handled by a third party escrow. Davis provided Yeh with the name of "Austin Escrow Services," which he said was an independent escrow agent. Yeh asked for references for Austin Escrow Services, and Davis faxed her a list of names, which included Thomas Chaffe. Davis told Yeh that Louis Lopez was the person who ran Austin Escrow Services. Yeh was still not comfortable sending the $300,000, so she asked Lopez for an insurance policy on the money. Davis sent her a fax stating that he "checked with the escrow company" and that they could provide an insurance policy for loss of funds. The fax also stated that Davis had just flown to Los Angeles to execute the contract for funding C&C Gateway's transaction and threatened to

-15-

reallocate the funds to other parties unless Yeh sent the money immediately. A few days later, Davis faxed Yeh a letter saying he understood that C&C Gateway's representatives had talked to Louis Lopez about the insurance policy. Davis stated that "Austin Escrow gets surety bonds on individual transactions," and he faxed what purported to be an insurance binder on the C&C Gateway transaction issued by Monopol. Yeh testified that she "purchased the cashier's check [and] held it in [her] hand and waited for Tony Davis' fax regarding the insurance policy on this $300,000." After receiving the faxed insurance binder, Yeh sent the $300,000 to Austin Escrow Services in Texas, attention Louis Lopez.

When C&C Gateway did not receive the funding as promised, Yeh checked with the bank where Austin Escrow Services kept its account and found that only a "couple hundred dollars" were left in the account. C&C Gateway never got back either its $100,000 fee or the $300,000 security deposit.

Lopez was actually a business associate of Davis's, who shared office space with Davis from 1993-96. Lopez worked with Davis to locate financial instruments to use as collateral, with the understanding that they would split the profits if they were ever successful. Lopez testified that Austin Escrow Services was Davis's company and that he falsely told Yeh that he was the escrow agent for Austin Escrow Services. He also testified that he told Yeh her money would be insured, but the only insurance he could point to at trial was Davis's insurance as a CPA. In the three years that Lopez worked with Davis, he saw large numbers of people

-16-

in the office who had waited for a long time to get their projects funded or even to see Davis, but he never knew of anyone actually getting funded by Davis. He spoke to Davis about whether Davis would get in trouble for representing to those people that they were going to be funded, and Davis told him that there were enough loopholes in the contract so that it wouldn't be a problem for him and that the contracts were written to allow him to make requirements that people would never be able to fulfill.

There was evidence from the Texas Department of Insurance, the agency that regulates escrows in Texas, that Austin Escrow Services never had a license to act as an escrow agent in Texas and that neither Davis nor Lopez had ever been lawful escrow agents in Texas. Moreover, Davis himself filed an assumed name certificate for Austin Escrow Services the day after Yeh sent the $300,000. Earlier that same month, Davis hired a telephone answering service for Austin Escrow Services. There was also evidence that the C&C Gateway check was deposited into an account for Tony R. Davis, doing business as Austin Escrow Services.

Yeh was induced to part with C&C Gateway's money by Davis's false faxes to Yeh about the existence of an escrow company and an insurance policy that never existed and Lopez's false representations that he was the escrow agent for Austin Escrow Services and that Austin Escrow Services had insurance. These facts provide ample evidence from which to infer that Davis and Lopez formed an agreement to defraud C&C Gateway, and that each

participated in the conspiracy to commit interstate wire fraud knowingly, intentionally, and voluntarily.

B.

Davis argues that there was insufficient evidence to support his convictions on Counts 9, 10, and 11 for money laundering, 18 U.S.C. § 1957. Section 1957 proscribes knowing engagement in a monetary transaction greater than $10,000 in property derived from certain specified crimes, which include interstate travel for fraudulent purposes, 18 U.S.C. §§ 1343 and 2314. As to all three money-laundering counts, Davis argues that the criminal transactions were not complete at the time of the monetary transactions, so that the monetary transactions could not be said to be in criminally derived property. As to Count 9, Davis argues that the government could only establish that $6,414.45 of the money used in the transaction was criminally derived, so that the $10,000 statutory threshold was not met.

Each of the three counts charges Davis with writing checks on accounts that contained money he had obtained from a fraud victim. Count 9 alleged that Davis wrote a $25,000 check on the account containing moneys obtained from DePawl Enterprises. In Count 10, he wrote a check for $50,000 on the bank account into which he had deposited Kelly's Spacelink check for $125,000. Finally, in Count 11, Davis wrote himself a check for $80,000 on the Austin Escrow Services account, which contained C&C Gateway's $300,000 "security deposit."

Davis contends that in each instance, the fraud was not complete at the time he drew the checks on the accounts because he had not yet failed to fund the victims' projects or return their refundable fees. This argument is legally untenable. The government's evidence was that Davis made false representations to obtain the money in the first place. He told Kelly he had a blind pool of cash out of which an initial draw of $1 million dollars could be made and gave him a brochure stating, "In the past few years [Davis] has arranged hundreds of millions of dollars of financing worldwide." Davis told Ernest Alexander, an officer of DePawl Enterprises, that he had a number of large investors whose money he controlled and that he had "signature authority" to release their funds. We have just stated above the false representations Davis made to Yeh about the existence of an independent escrow agency run by Louis Lopez. In contrast to Davis's assertions, the evidence at trial showed that Davis's close associate Lopez had never known of Davis funding anyone in the years he worked with him; indeed, Davis explained to Lopez that he had drawn the contracts in such a way that he would never have to fund them. The fifteen victims who testified at trial testified that their funding dates came and went with no funding; that their attempts to obtain refunds were met with unending temporizing, evasion, and promises of imminent funding that were never fulfilled; and that the few who obtained any refunds received them in small increments totally inconsistent with Davis controlling millions of dollars in a blind pool with signature authority. When

asked to explain how he planned to provide funding, Davis would show financial instruments purportedly worth millions and even billions of dollars that he had gotten for free. In each of the money laundering counts, the fraud was complete when Davis obtained the money from the victim by means of false representations and with no intent to fund the projects or refund the fees. "Fraudulent schemes produce proceeds, at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the <u>control</u> of the perpetrators." <u>United States v. Leahy</u>, 82 F.3d 624, 635 (5th Cir. 1996) (internal quotations omitted). Davis's subsequent withdrawals of money obtained from the victims were therefore transactions involving proceeds of the fraud. <u>Accord</u> <u>United States v. Dupre</u>, 117 F.3d 810, 821-22 (5th Cir. 1997).

Count 9 charged Davis with issuing a check to Wright & Greenhill, P.C., for $25,000 from moneys derived from wire fraud. The government adduced evidence that the check was written on a Forum Financial bank account which had received the $100,000 wired from Alexander, on behalf of DePawl Enterprises. When DePawl Enterprises wired the money to the Forum account on February 25, 1994, the account already contained $18,585.55. Therefore, Davis argues, only the $6,414.45 difference between $25,000 and $18,585.55 should be considered money Davis got from DePawl Enterprises and, thus, proceeds from specified criminal activity. This is less than the $10,000 threshold amount specified in section 1957. <u>See</u> <u>United States v. Adams</u>, 74 F.3d 1093, 1101 (11th Cir.

-20-

1996) (under § 1957 there must be proof that transaction involved more than $10,000 of tainted money).  Cf. United States v. Tencer, 107 F.3d 1120, 1131 (5th Cir. 1997) (section 1956 requires only that any part of transaction involved tainted funds).

The government introduced banking records showing various withdrawals, made after receipt of the $100,000, that totaled more than $100,000.  One of these withdrawals was the $25,000 check to Wright & Greenhill, which brought the account balance to $13,579.62 on March 14, 1994, the day the check cleared the account.

Obviously, when tainted money is mingled with untainted money in a bank account, there is no longer any way to distinguish the tainted from the untainted because money is fungible.  See United States v. Ward, 197 F.3d 1076, 1083 (11th Cir. 1999); United States v. Moore, 27 F.3d 969, 976-77 (4th Cir. 1994) (cannot distinguish without resort to "arbitrary" accounting techniques).

This Circuit has grappled with the commingling problem in cases dealing with interstate transfer of funds obtained by fraud.  There, we have developed the rule that when the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account.  In United States v. Heath, 970 F.2d 1397, 1404 (5th Cir. 1992), the defendants were convicted for transferring a total of $2.2 million to New York from an account into which they had deposited $6 million in tainted funds and $800,000 in clean funds.  They argued that each individual transfer

-21-

named in the indictment was in an amount less than $800,000, and therefore the government had not proved that any particular transfer was of the tainted money, rather than the clean. We upheld the conviction. We distinguished <u>United States v. Poole</u>, 557 F.2d 531 (5th Cir. 1977), where we reversed a conviction based on use of commingled funds because the check in question was for less than the amount of clean funds in the account and therefore the check could have come from the clean funds. We noted in <u>Heath</u> that we should examine the aggregate amount of the defendant's transfers in deciding whether the defendant could be said to have engaged in a transaction in tainted funds: "To view each transaction in isolation . . . would defeat the purposes of the statute, allowing sophisticated criminals to spirit stolen funds from one state to another, so long as each check written did not exceed the amount of legitimate funds on hand in the bank account." 970 F.2d at 1403 (internal citation and quotations omitted). We concluded: "We are satisfied that, having proved beyond a reasonable doubt that the aggregate taken from the account exceeded the amount of clean funds available, the Government met its burden." <u>Id.</u> at 1404.

The commingling problem under the money laundering statutes is the same as under the transfer of funds statute, and so we apply our own precedents, rather than choosing between the commingling rules applied in other circuits, as the parties urge us to do. <u>Compare</u> <u>United States v. Sokolow</u>, 91 F.3d 396, 409 (3d Cir. 1996) (where money commingled, government does not have to trace proceeds

-22-

to prove money tainted under section 1957); <u>Moore</u>, 27 F.3d at 976-77 (where clean and tainted money has been commingled, any withdrawal from account is presumed tainted under section 1957, up to amount of tainted moneys deposited); <u>with</u> <u>United States v. Rutgard</u>, 116 F.3d 1270, 1292 (9th Cir. 1997) (in case of commingling, withdrawal is only shown to be tainted under section 1957 if it is the entire balance of commingled account).

In this case, the government proved aggregate withdrawals of far more than $10,000 above the amount of clean funds available. We therefore reject Davis's contention that there was insufficient evidence to show that his $25,000 check to Wright & Greenhill contained more than $10,000 of tainted funds.

V.

Davis makes various claims of instructional error. "A district court has broad discretion in framing the instructions to the jury and this Court will not reverse unless the instructions taken as a whole do not correctly reflect the issues and law." <u>United States v. Moser</u>, 123 F.3d 813, 825 (5th Cir. 1997) (internal quotations omitted).

A.

Davis contends that the district court erred in instructing the jury that it could find Davis had knowledge of a fact if it found he "deliberately closed his eyes to what would otherwise have been obvious to him." A district court may give a deliberate ignorance instruction if the defendant claims he had no guilty knowledge (as Davis claimed) and if the evidence shows a "charade

of ignorance."  See Moser, 123 F.3d at 825.  On the facts as we have already recited them, Davis's argument that there was no evidence of willful blindness borders on the frivolous.  For only one instance, Davis's purported reliance on the Industrial Bank of Kibris guaranty for $100 million, which he got for free, supports the instruction.  Cf. United States v. Threadgill, 172 F.3d 357, 368-69 (5th Cir.) (where evidence did not show deliberate ignorance, but actual knowledge, submission of deliberate ignorance instruction harmless error), cert. denied, 120 S. Ct. 172 (1999).  Therefore, we reject this argument.

### B.

Davis objects to the district court's instruction to the jury on victim naivety.  The court instructed the jury:

> You are instructed that the naivety, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct, if any, on the part of a defendant. The laws protecting against fraud are most needed to protect the careless and the naive from perpetrators of fraud.  Even the monumental credulity of a victim does not excuse a defendant's fraud, if any.

Davis contends this is an incorrect statement of the law because a misrepresentation is only material if a reasonable person would rely on it; therefore, he contends, a statement on which only a stupid or inexperienced person would rely cannot be material.[2]

Davis's argument about the meaning of materiality ignores the Supreme Court's discussion in Neder v. United States, 527 U.S. 1

---

[2]The district court did not define materiality for the jury. Davis does not argue for reversal based on the mere failure to define materiality, but rather that this failure helped make the naivety instruction misleading.

(1999).  In holding that materiality was an element of the federal mail, wire, and bank fraud statutes, 18 U.S.C. § 1341, 1343, and 1344, the Court noted the Restatement (Second) of Torts definition for materiality:

> The Restatement instructs that a matter is material if:
>
> > "(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or
> > "(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." Restatement (Second) of Torts § 538 (1976).

527 U.S. at 22 n.5.  See also United States v. Richards, 204 F.3d 177, 191-92 (5th Cir. 2000) (Fifth Circuit applies definition of materiality from footnote 5 of Neder), petition for cert. filed, 68 U.S.L.W. 3002 (U.S. June 20, 2000) (No. 99-2049).  Earlier in Neder, the Supreme Court quoted another definition of materiality, used in cases under federal perjury statutes:  "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  Id. at 16 (quoting United States v. Gaudin, 515 U.S. 506, 509 (1995)).  Under these definitions, a statement could indeed be material, even though only an unreasonable person would rely on it, if the maker knew or had reason to know his victim was likely so to rely.  Davis's argument that a misrepresentation must be one on which a reasonable person would rely ignores this alternative way of showing materiality.

The naivety instruction given in this case only discusses a possible defense to proven fraud. Therefore, it does not go into whether the defendant knew or should have known the victim would rely on the statements. Although the instruction does not discuss the circumstances under which a statement can be material even though only an unreasonable person would rely on it, the instruction does not purport to define materiality, and it is correct as far as it goes. The instruction is a paraphrase of our own language in United States v. Kreimer, 609 F.2d 126, 132 (5th Cir. 1980). Accord United States v. Coyle, 63 F.3d 1239, 1244 (3d Cir. 1995)("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."). The district court did not err in giving this instruction to the jury.

VI.

Davis contends the court erred in imposing sentence.

A.

Davis argues that the district court erred in sentencing him under the money-laundering guidelines, rather than under the fraud guidelines. Because Davis was convicted of closely related offenses, the conspiracy, wire fraud, travel and transportation of securities for fraudulent purposes, and money-laundering counts were grouped together and assigned a single offense level. See U.S.S.G. §§ 3D1.1, 3D1.2 (1998). The offense level is derived from the most serious count in the group. See U.S.S.G. § 3D1.3(a) (1998). These rules led to the use of the money-laundering guideline applicable to offenses under 18 U.S.C. § 1957, which is

U.S.S.G. § 2S1.2.  Davis does not argue that the district court misapplied those rules, but rather that his case falls outside the heartland of money-laundering offenses covered by section 2S1.2. Therefore, his argument is actually that the district court erred in refusing to depart from the money-laundering guideline.

"This court can review a district court's refusal to depart from the guidelines only if the district court based its decision upon an erroneous belief that it lacked the authority to depart. Moreover, something in the record must indicate that the district court held such an erroneous belief."  United States v. Valencia-Gonzales, 172 F.3d 344, 346 (5th Cir. 1999) (internal quotations omitted), cert. denied, 120 S. Ct. 222 (1999).  The district judge's remarks at sentencing do not suggest that he believed he lacked authority to depart.  Instead, the court evaluated the facts of this case, determined that they fell within the heartland of the guideline, and therefore declined to depart.  Where the district court understands that it has the authority to depart if there are circumstances the guidelines have not taken into consideration, but determines that the case at hand does not present such circumstances, its decision not to depart is unreviewable.  See United States v. Palmer, 122 F.3d 215, 222 (5th Cir. 1997).  This is such a case.

### B.

Davis also argues that the district court erred in giving him a four-level upward adjustment for being an organizer or leader of a criminal activity that involved five or more participants or was

-27-

otherwise extensive.  See U.S.S.G. § 3B1.1(a)(1998).  Davis argues that his scheme was not extensive within the meaning of section 3B1.1 because it only involved two co-conspirators.

We review for clear error the district court's determination that Davis was an organizer or leader.  See United States v. Glinsey, 209 F.3d 386, 396 (5th Cir. 2000), petition for cert. filed (U.S. June 11, 2000) (No. 99-10242).

The commentary to section 3B1.1 defines participants as people who are criminally responsible for the offense.  See § 3B1.1, cmt. n. 1; United States v. Maloof, 205 F.3d 819, 830 (5th Cir. 2000), petition for cert. filed, 69 U.S.L.W. 3086 (July 5, 2000) (No. 00-43).  The government does not contend that there were five participants, but that the scheme was "otherwise extensive" because the services of more than twenty people made the fraudulent scheme possible.  In deciding whether a scheme was otherwise extensive, the district court must take into account "all persons involved during the course of the entire offense."  See Glinsey, 209 F.3d at 396.  Those who assisted Davis included employees of Forum Financial; loan brokers who referred clients to Davis; lawyers who wrote misleading letters of reference for Davis; and those who provided due diligence reports on various projects Davis was supposed to finance.  These people contributed to the success of the scheme.  See United States v. Sidhu, 130 F.3d 644, 655 (5th Cir. 1997) (affirming upward adjustment where insurance fraud could not have succeeded without unknowing assistance of insurance

companies' employees). The district court's finding that the scheme was otherwise extensive is not clearly erroneous.

C.

Davis makes various other arguments attacking the district court's factual findings in its sentencing determination. In particular, he attacks the evidentiary basis of the district court's finding of an aggregate loss amount of $3,609,937.79. This amount included the losses of victims who did not testify at trial, but who were listed in the presentence investigation report. Significantly, Davis's attorney stated he would not object to a restitution order in that amount, although he declined to stipulate to the amount.

> '[A] presentence report generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations required by the sentencing guidelines.' A district court may adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence.

United States v. Alford, 142 F.3d 825, 831-32 (5th Cir.) (citation omitted)(quoting United States v. Sanders, 942 F.2d 894, 898 (5th Cir. 1991)), cert. denied, 525 U.S. 1003 (1998); see United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999), cert. denied, 120 S. Ct. 1238 (2000). Davis has not presented any evidence rebutting the facts in the PSR upon which the district court relied. The district court's findings are not clearly erroneous.

Davis also contends that the district court should have subtracted from the loss amount the expenses he incurred seeking financing for the victims. This argument presupposes that Davis

incurred those expenses in a legitimate effort to find financing for the victims, an assumption that is at odds with the jury verdicts we have upheld.  Davis has not shown that the district court committed clear error in calculating his sentence.

We have reviewed Davis's other sentencing arguments and find no clear error.

* * *

We affirm Davis's convictions and sentence.