CHUTZ, J.
|2On January 20, 2004, a grand jury returned an indictment charging Morel G.' Lemoine Distributors, Inc., Martin G. Lemoine, and Veronica Lemoine with conspiracy to commit money laundering (count 1), violations of La. R.S. 14:26 and 14:230; money laundering (count 2), a violation of La. R.S. 14:230; and racketeering (count 3), a violation of La. R.S. 15:1351, et seq. The defendants pled not guilty to the charges. The indictment charged that the offenses occurred between March 15, 1995 and March 6, 1998. The defendants moved to quash the indictment on the grounds that the charges were not brought within the legal delays allowed under Louisiana law. After a hearing, the trial court granted the motion to quash in part, based on the time limitations.' The racketeering charges were dismissed because they had a five-year statute of limitations; and the portion of the money laundering (and conspiracy) charges that alleged offenses occurring more than six years prior to the indictment were also dismissed. Accord-' ingly, the charged period against the defendants was reduced to a ■ forty-six-day time period, from January 20, 1998 through March 6, 1998. The trial court found that the State had not alleged sufficient facts to support a violation of the money laundering statute, but gave the State an opportunity to amend the bill of particulars. The State filed an amended bill, which indicated that payments were made by checks deposited into the operating account of Morel G. Lemoine Distributors, Inc. (Morel). The trial court denied the motion to quash the money laundering charges, finding that the State’s amended' bill alleged a violation of some sections of the money laundering statute.
The defendants took writs with this court, arguing that- the money laundering charges should have been quashed because there was no evidence to show how much money was received by the defendants as a result of the alleged inflating of invoices during the charged time period. The defendants contended that because of |sthe graduated nature of the penalties for money laundering, the State was required to allege a specific amount. On August 23, 2005, this court denied the writ in part and granted the-writ in part; regarding the money laundering crimes, we found that the State’s allegations, if proven true, constituted the crimes charged according to the language of La. R.S. 14:230 and La. R.S. 14:26. We remanded the matter with instructions that the trial court reopen the evidentiary hearing, allowing the State an opportunity to prove whether the amount of funds obtained by the defendants as a result of inflating-invoices, after January *34 20, 1998, totaled $20,000.00 or more in order to demonstrate that the six-year time limitation of La.C.Cr.P. art. 572(A)(1) was applicable. With regard to the defendant, Veronica Lemoine, we granted the writ application, finding that the bill of particulars and amended bill of particulars did not clearly allege her activities subsequent to the initial criminal act of inflating invoices to the Union Pacific Railroad Company. The matter was remanded with instructions that the trial court allow the State an opportunity to amend the bill of particulars in order to clarify whether Veronica Lemoine engaged in any activity that would constitute money laundering. See State v. Morel G. Lemoine Distributors, Inc., 2005-0734 (La.App. 1st Cir.8/23/05) (unpublished writ). The defendants sought supervisory review with the Louisiana Supreme Court, which was denied. See State v. Morel G. Lemoine Distributors, Inc., 2005-2457 (La.9/15/06), 936 So.2d 1254.
On January 22, 2007, the trial court held a hearing on the remand from this court and ruled that the State met its burden and, as such, it was not necessary to consider evidence submitted by the defense. The defendants filed supervisory writs with this court, arguing that the trial court erred in considering only the State’s evidence. On May 29, 2007, we granted the writ application and remanded with instructions for the trial court to reopen the hearing on the motion to quash to allow the State the opportunity to prove, pursuant to La.C.Cr.P. art. 577, whether |4the amount of funds obtained by the defendants as a result of inflating invoices to the railroad company, after January 20, 1998, totaled $20,000.00 or more in order to demonstrate that the six-year time limitation of Article 572(A)(1) is applicable. See State v. Morel G. Lemoine Distributors, Inc., 2007-0768 (La.App. 1st Cir.5/29/07) (unpublished writ).
Based on the foregoing, the trial court conducted a motion to quash hearing on August 13, 2008. At this same hearing, the defendants raised a separate motion to quash based on our recent decision (at that time) in State v. Odom, 2007-0516 (La.App. 1st Cir.7/31/08), 993 So.2d 663 (per curiam). The trial court denied the motion to quash based on Odom.[1] Regarding the motion to quash claim based on time limitations, the trial court denied the. motion. In its written reasons issued on November 20, 2008, the trial court stated that based upon the evidence at the motion to quash hearing, it was more probable than not that the prosecution should not be barred by prescription. The trial court found the State proved to its satisfaction that the $20,000.00 statutory threshold was met. The trial court further stated that any shortcomings in the State’s case should be determined by the trier of fact at a trial on the merits. The defendants sought supervisory review with the supreme court, which was denied. See State v. Morel G. Lemoine Distributors, Inc., 2009-1979 (La.11/20/09), 25 So.3d 789.
On November 17, 2010, the defendants filed a motion to quash counts 1 and 2 (the money laundering counts) for duplicity. At a hearing on January 5, 2011, the trial court granted the motion, finding that each transaction would be considered a count of money laundering, requiring each count to *35 be set out in the |,^indictment. The State sought writs. Granting the writ, we found the trial court erred in ordering the State to sever each occurrence of money laundering into particular counts. We noted the indictment was not duplicitous as the occurrences were part of a common scheme or plan. See State v. Morel G. Lemoine Distributors, Inc., 2011-0890 (La.App. 1st Cir.9/26/11) (unpublished writ). The defendants sought review with the Louisiana Supreme Court, which was denied. See State v. Lemoine, 2011-2388 (La.2/3/12), 79 So.3d 328.
Trial began on August 26, 2013. Prior to voir dire, the trial court granted the motion to quash regarding Veronica Lem-oine as a defendant, and she was dismissed. The State also dismissed the charges against Morel G. Lemoine Distributors, Inc. Finally, the parties made clear that the only charge against the sole defendant, Martin G. Lemoine, was one count of money laundering, pursuant to La. R.S. 14:230(B)(2). Following the jury trial, the defendant was found guilty as charged. The defendant filed a motion for postver-dict judgment of acquittal. Following a hearing on the matter, the trial court took the matter under advisement. Subsequently, the trial court granted the motion for postverdict judgment of acquittal “for reasons stated in the Defendant’s memo-randa in support thereof and adopted by this Court as its own.” The State now appeals, designating one assignment of error. We affirm the trial court’s ruling reversing the defendant’s conviction.

FACTS

The defendant was president of Morel, a New Roads company that supplied diesel fuel to Union Pacific Railroad (U.P.) at the rail yard in Livonia, Point Coupee Parish. In the mid-1990s, from about 1995 to 1997, several drivers drove bobtail fuel trucks for Morel with carrying capacities of up to 5,000 gallons of fuel. Morel’s drivers most often traveled to Valero Refining Company in Krotz Springs, and occasionally to Placid Refining Company in Port Allen, to fill their trucks up |Rwith high-sulfur diesel fuel. These refineries converted crude oil into petroleum products, including diesel, ethanol, gasoline, liquid petroleum gas, jet fuel, and fuel oils. After a driver filled his truck up, he was issued a fuel manifest from the refinery. The manifest contained pertinent information, on it such as the date, the name of the refinery, the name of the driver, and how many gallons of fuel were pumped into a truck. From the refinery, Morel’s drivers drove to the U.P. rail yard and transferred the fuel in the trucks directly into the locomotives, as opposed to directly to the storage fuel tanks at the yard. This refueling of the locomotives was continuous and around the clock and, as such, generated many fuel manifests. When a Morel driver finished fueling a locomotive, he handwrote the engine number and the number of gallons he transferred to the engine on the bottom of the fuel manifest he had received from the refinery. A single manifest could contain anywhere from a few engine numbers up to ten or so engine numbers and the corresponding numbers of gallons of fuel transferred to each engine. At the end of a day or shift, each driver gave his stack of manifests to Morel’s lead driver, who from 1995 to 1997, was Keith Glaser. Glaser transferred the handwritten information on the fuel manifests to a field ticket. A single field ticket could contain a half-dozen or more engine numbers and the corresponding gallons of fuel pumped into each engine. Glaser handwrote the field ticket number onto its corresponding fuel manifest so that Morel could keep track of when, where, and how much it was fueling. Rex Averill, who worked in Morel’s office as a truck dispatcher, also generated the *36 invoices based on the numbers on the field tickets. Invoices referenced the fuel manifests by number and contained the amount of fuel transferred into a U.P. locomotive bn a particular date. Invoices also included the unit price of a gallon of fuel, usually around $.50 per gallon. The Morel invoice multiplied the unit price by the number of gallons to determine the total amount (minus the sales tax) it would charge U.P. for the diesel fuel. Averill sent these | invoices to U.P. U.P. paid Morel with company checks, which were deposited into Morel’s business checking account.
Averill testified at trial that during Glaser’s time' at Morel in the mid-1990s, Glaser inflated the amounts of diesel fuel on the field tickets. Glaser did not testify at trial. Averill knew Glaser was doing this, and he (Averill) would transfer these inflated numbers-to the invoices that were sent to U.P. Accordingly, U.P. was getting overbilled or overcharged for the amount of fuel it was actually receiving in its locomotives. For example, a June 29, 1996 Valero fuel manifest (Valero was Basis Petroleum, Inc. at that time) listed in handwritten form the fourth U.P. engine as No. 2251, and the number of gallons of diesel fuel pumped into that engine as 1,630. On the invoice, however, the quantity of diesel fuel that is indicated as having been pumped into U.P. engine No. 2251 is 2,051 gallons.
Stephen Paddy, a U.P. • Special Agent, testified at trial about the alleged fraudulent billing scheme from 1995 to 1997. Agent Paddy presented many examples of gallons of fuel being inflated on Morel’s invoices, and testified that the inflation was often by 200 to 300 gallons. The fuel manifests from 1995 to 1997 that were introduced into evidence all contained scratched out fuel amounts; that is, after the U.P. engine number and the amount of fuel pumped into that engine were handwritten on the-bottom*of the manifest, the fuel amounts were subsequently .scratched out with an ink pen in an apparent attempt to'hide the actual amount of fuel transferred into an engine. -If there was no number of gallons of diesel fuel on the manifest, then there was no number to compare the inflated number to that was on Morel’s invoices to U.P. It appears that when Glaser was fired from Morel in late 1997, he threatened the defendant with telling U.P. about the billing scheme. Shortly thereafter, Veronica Lemoine, the defendant’s wife, and Averill ■ began scratching out. the fuel gallon amounts on the manifests.. According to Averill, Veronica did the vast majority of the scratching out.
IsAll of the fuel manifests that contained scratch-outs and their corresponding invoices and field tickets were from ’the years 1995 through 1997. The fuel manifests in 1998 (and onward) did not have any- scratch-outs - on them. The charged time period of money laundering, as alleged in the indictment, was from January 20, 1998 to March 6, 1998. According to Agent Paddy, the. defendant’s billing scheme stopped by March 6,1998 because, by this time, U.P. at the Livonia rail yard had gone “on line”; that is, U.P. obtained its own fueling facility. Agent Paddy testified that since U.P. had its own tanks in the yard and; further, since everything was metered, padding invoices was impossible.
Averill also testified that by the beginning of 1998, there were no more scratch-outs on the fuel manifests because there were too many “checks and balances.” The fuel was metered at four different checkpoints, according to Averill. He maintained, however, that the fuel inflation still continued in 1998. According to Ave-rill, beginning in 1998, the drivers no longer handwrote the engine numbers and gallons on the fuel manifests. As such, there *37 was nothing to scratch out. Also, Morel no longer used field tickets. Averill testified that instead of recording the number of gallons of fuel on the manifests, they were. written on any piece of paper — a shop towel or toilet paper. Averill. used these numbers to make the invoices, then threw away the pieces of paper. Averill stated that he personally inflated the numbers on the invoices and sent them to U.P. for payment. Averill was fired from Morel in early 2002, and in 2003, he went to work for U.P., and told U.P. about Morel’s alleged fraudulent billing scheme. .Averill testified that he paid Glaser to pad the invoices at the behest of the defendant, which occurred prior to the charged time period (1995 to 1997). During the charged time period of forty-six days in early 1998, after Glaser had already been fired, Averill testified he continued the inflation of the invoices, but he was not paid anything extra by the defendant to maintain the scheme.
IflChristopher Peters, who qualified as an expert in forensic accounting, testified for the State. A certified fraud examiner, Peters was asked to analyze the documentation associated with the forty-six-day charged time period. Since there were no field tickets during this time period, Peters linked the invoices to the fuel manifests by date. Peters added the total number of gallons of fuel on all the invoices from a single day and compared that amount to the total number of gallons on the manifests from that same day. For example, Peters added up all the gallons of fuel on the manifests dated January 20, 1998, which totaled 40,668 gallons. There were four separate invoices dated January 20, 1998, with different amounts of gallons of fuel on each invoice corresponding to the manifests. The total amount of fuel on these four invoices was 43,096 gallons. According to Peters, this meant that Morel charged U.P. for more gallons, or 2,428 gallons, than-it had actually pumped into its trucks at the refineries and then delivered to U.P. On -some days, Morel charged U.P. for less, gallons than it (Morel) had actually purchased from the refineries. For example, on January 21, 1998, the total amount of fuel purchased from the refineries by Morel was 39,854 gallons. The total amount of fuel sold to U.P. on that same day, January 21, 1998, was 27,-732 gallons. An analysis of the daily differences, or the variances on .each day, did not necessarily indicate any scheme or pattern because, on seventeen days of the forty-six days at issue, Morel charged U.P. for less fuel than it purchased. In other words, on these seventeen days, Morel was giving U.P. a credit. Peters explained that Morel’s crediting back' some of the money that it had taken within the overall framework of stealing money from U.P. was Morel’s way of hiding what it was actually doing. It was part of the sophistication of the scheme, according to Peters. Thus, according to Peters, the important number in his analysis was the cumulative difference, or the total variance over all forty-six days, between the number of gallons of fuel on all the fuel manifests and the number of gallons of fuel on all the | ^corresponding' invoices that Morel sent to U.P. for payment. Peters testified that of the around two million gallons of diesel fuel that was sold over the forty-six-day period, U.P. was overcharged (or over-billed) for 111,000 gallons of fuel, which amounted to about $55,000.00.

ASSIGNMENT OF ERROR

In its sole assignment of error, the State argues the trial court erred in granting the defendant’s motion for postverdict judgment of acquittal. Specifically, the State contends the trial court substituted its opinion for the jury’s unanimous verdict *38 wherein there was no reasonable doubt of the defendant’s guilt.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const, amend. XIV; La. Const, art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 807, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also State v. Ordodi, 2006-0207 (La.11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Patorno, 2001-2585 (La.App. 1st Cir.6/21/02), 822 So.2d 141, 144.
The defendant filed a motion for post-verdict judgment of acquittal with incorporated memorandum of law. In his memorandum, the defendant challenges the sufficiency of the evidence raising three separate issues:
hi(l) The State failed to offer proof sufficient to reasonably support a guilty verdict of the offense allegedly underlying the money laundering charge — the State failed to prove he sent any invoice during the charged time period which billed the railroad for more fuel than it received.
(2) The State failed to offer any evidence whatsoever to attempt to prove that he acted for the purpose of committing or furthering the commission of any criminal activity as required by La. R.S. 14:230(B)(2).
(3)He is entitled to a postverdict judgment of acquittal as to any grade of the offense beyond the misdemeanor defined in La. R.S. 14:230(E) because the evidence clearly shows that the “value of the funds” was less than $3,000 since the “things of value” in the case were checks, while “funds” is defined in the statute as cash.
We agree with the defendant regarding the second issue. The evidence as a matter of law was insufficient to convict because the State failed to prove every element of the offense. Specifically, the State failed to prove the defendant knowingly acted in a way for the purpose of committing or furthering the commission of any criminal activity. Because the foregoing analysis disposes of the sufficiency issue in its entirety, we do not address the other arguments raised by the defendant.
In 1998, La. R.S. 14:230 provided in pertinent part:
A. As used in this Section:
(1) “Criminal activity” means any offense, including conspiracy and attempt to commit the offense, that is classified as a felony under the laws of this state or the United States or that is punishable by confinement for more than one year under the laws of another state.
(2) “Funds” means any of the following:
(a) Coin or paper money of the United States or any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issue.
(b) United States silver certificates, United States Treasury notes, and Federal Reserve System notes.
*39 |12(c) Official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country and foreign bank drafts.[2]
(3) “Peace officer” has the same meaning as in R.S. 40:2402(l)(a).
(4) “Proceeds” means funds acquired or derived directly or indirectly from or produced or realized through an act.
B. It is unlawful for any person knowingly to do any of the following:
(1) Conduct, supervise, or facilitate a financial transaction involving proceeds known to be derived from criminal activity, when the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or the control of proceeds known to be derived from such violation or to avoid a transaction reporting requirement under state or federal law.
(2) Give, sell, transfer, trade, invest, conceal, transport, maintain an interest in, or otherwise make available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity.
(3) Direct, plan, organize, initiate, finance, manage, supervise, or facilitate the transportation or transfer of proceeds known to be derived from any violation of criminal activity.
(4) Receive or acquire proceeds derived from any violation of criminal activity, or knowingly or intentionally engage in any transaction that the person knows involves proceeds from any such violations.
(5) Acquire or maintain an interest in, receive, conceal, possess, transfer, or transport the proceeds of criminal activity.
(6) Invest, expend, or receive, or offer to invest, expend, or receive, the proceeds of criminal activity.
The provision at issue in this case was La. R.S. 14:230(B)(2). There is very little jurisprudence in Louisiana addressing La. R.S. 14:230, in general, and none that addresses the merits of La. R.S. 14:230(B)(2) in particular.
1 iaWe note the similarity of our law with its federal counterpart 18 U.S.C.A. § 1956 (Laundering of monetary instruments), which provides in pertinent part:
(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
(A)(i) with the intent to promote the carrying on of specified unlawful activity; or
(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
*40 ■ (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine....
(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
(A) with the intent to promote the carrying on of specified unlawful activity; or
(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
(ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine....
(3) Whoever, with the intent—
(A) to promote the carrying on of specified unlawful activity;
| U(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
(C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.
In State v. Dudley, 2006-1087 (La.App. 1st Cir.9/19/07), 984 So.2d 11, the defendant was charged with several counts of Medicaid fraud, theft, and money laundering. Upon noting the language under La. R.S. 14:230(B)(1), we found that the provision closely resembled 18 U.S.C. § 1956(a)(l)(B)(i) and, as such, the federal jurisprudence interpreting the statute was highly instructive. Id. at 19.
As noted, the only provision under which the defendant was charged was La. R.S. 14:230(B)(2), which provides that it is unlawful for any person knowingly to give, sell, transfer, trade, invest, conceal, transport, maintain an interest in, or otherwise make available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity. The sole means by which Morel was paid by U.P. was with checks. Section (B)(2) covers “anything of value.” La. R.S. 14:2(2) provides that “anything of value” must be given the broadest possible construction, including any conceivable thing of the slightest value, movable or immovable, corporeal or incorporeal, public or private, and including transportation, telephone and telegraph services, or any other service available for hire. It must be construed in the broad popular sense of the phrase, not necessarily as synonymous with the traditional legal term “property.” Accordingly, the “anything of value” language of Section (B)(2) includes checks.
While it appears the defendant arguably committed some type of theft or fraud during his transactions with U.P., at least during that time prior to the | ^charged time period (January 20, 1998 to March 6, 1998), such a crime would have constituted the predicate offense, or that activity that our money laundering statute refers to as “criminal activity.” See La. R.S. *41 14:230(B)(1), (2), (3), (4), (5), & (6). When that criminal activity is manipulated to disguise or conceal the nature, source, or ownership of proceeds derived from such activity, money laundering is the necessary result. We point this out because some of the provisions of La. R.S. 14:230(B) have been drafted in such a way that the predicate offense has merged so completely with the offense of money laundering, that it appears that the crime of theft under several of the provisions would also constitute money laundering, with no requirement of any additional element. For example, under Section (B)(6), it is unlawful for any person knowingly to invest, expend, or receive, or offer to invest, expend, or receive, the proceeds of criminal activity. Under a plain reading of this provision, if a person robbed a. cashier at a convenience store, he would have committed money laundering since he received proceeds of criminal activity. We think money laundering requires more. A survey of the federal jurisprudence instructs on the proper understanding and application of the money laundering statute.'
In United States v. Sanders, 928 F.2d 940, 944-45 (10th Cir.), cert. denied, 502 U.S. 845, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991), the defendant purchased two automobiles with the proceeds of drug transactions, and was convicted of two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)®. On appeal, the defendant argued there was insufficient evidence that these car purchase transactions were designed to conceal the identity of the participants to sustain his convictions for violating the money laundering statute. The defendant argued that a necessary element of a violation of the money laundering statute was knowledge that the transaction in question was designed at least in part to conceal or disguise the nature, the source, the ownership, or the control of the proceeds of 11fiunlawful activities., Specifically, the defendant contended that the undisputed fact that he and his wife were personally present when the cars were purchased and that they used the cars conspicuously after they were purchased undermined the element of concealment.
In reversing the defendant’s money laundering convictions the Tenth Circuit in Sanders, 928 F.2d at 946, stated in pertinent part: .
We reject the government’s argument that the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity. To so interpret the statute would, in the court’s view, turn the money laundering statute into a “money spending statute.” This interpretation' would be contrary to Congress’ expressly stated intent that the transactions being criminalized in the statute are those transactions “designed to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity.” 18 U.S.C. § 1956(a)(1)(B)®. Thus, by the express terms of the statute, a design to conceal or disguise the source or nature of the proceeds is a necessary element for a money laundering conviction. In other words, the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities. (Footnote omitted.)
In United States v. Edgmon, 952 F.2d 1206, 1213-14 (10th Cir.1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d *42 906 (1992), the Tenth Circuit discussed legislative intent:
Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered. The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity. The Senate report on the money laundering bill makes plain that the bill was intended to create a “new Federal offense against money laundering.” Sen.R. 99-433 at 4. The discussion throughout the report is of the gap in the criminal law with respect to the post-crime hiding of the illgotten gains. See id. at 1-9. The Senate report and the statute itself indicate that the Congress intended simply to add a new criminal offense to punish activity that was not previously punished criminally. Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior “specified unlawful activity.” Congress enacted the money laundering statute to provide a punishment in addition to |17other punishment rather than instead of other punishment. We find that Congress intended money laundering and the “specified unlawful activity” to be separate offenses separately punishable.
In United States v. Castellini, 392 F.3d 35, 45 (1st Cir.2004), the defendant argued that the agent never represented the money to be the proceeds of unlawful activity, and so no rational jury could conclude that element of the crime was proven. The Castellini court opined:
The argument is based on the general rule that the money laundering statute is meant to punish a separate offense from the underlying “specified unlawful activity,” and thus, it criminalizes separate financial transactions involving the funds derived from such illegal activity. See United States v. Mankarious, 151 F.3d 694, 705 (7th Cir.1998) [cert. denied, 525 U.S. 1056, 119 S.Ct. 621, 142 L.Ed.2d 560 (1998) ] (“Money laundering requires proceeds of a discrete predicate crime. That predicate crime must have produced proceeds in acts distinct from the conduct that constitutes money laundering.”); United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir.1994) [cert. denied sub nom. Weinstein v. United States, 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994) ] (Money laundering is a “separate crime distinct from the underlying offense that generated the money”).
Later, when the defendant argued that even if he transferred funds around the world, what he did was simply aiding and abetting bankruptcy fraud and could not simultaneously be money laundering, in Castellini 392 F.3d at 47, the First Circuit stated:
The argument has some attraction, particularly in light of the doctrine, broadly stated, that money laundering requires there to be proceeds of illegal activity and cannot be the same as the illegal activity which produces the proceeds. The money laundering statutes “interdict only the financial transactions ..., not the anterior criminal conduct that yielded the funds allegedly laundered.” United States v. Cabrales, 524 U.S. 1, 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998); see also Mankarious, 151 F.3d at 704 (“A money launderer must obtain proceeds before laundering can take place”).
In United States v. Shellef 732 F.Supp.2d 42, 72-73 (E.D.N.Y.2010), the federal district court stated:
Because, by definition, money laundering involves the proceeds of unlawful *43 activity, it is well settled that the transaction charged as money laundering cannot be the same transaction through which the funds became tainted by crime. See United States v. Napoli, 54 F.3d 68, 68 (2d Cir.1995), abrogated on other grounds by U.S. Sentencing Guidelines as stated in United States v. Genao, 343 F.3d 578, 584 (2d Cir.2003); see also United States v. Hall, 613 F.3d 249, 254 (D.C.Cir.2010) [cert. denied, 562 U.S. 1223, 131 S.Ct. 1471, 179 L.Ed.2d 313 (2011) ] (“The offense of money laundering must be separate and distinct from the underlying offense that generated the money to be laundered.” (collecting cases)); United States v. Trejo, 610 F.3d 308, No. 07-40216, [sic] 610 F.3d 308, 318 (5th Cir.2010) (rejecting argument on money laundering count that would “run afoul of Congressional intent to create an offense distinct from the underlying crime that generated the dirty money in the first place”).
In addition to money laundering being separate and distinct from the underlying offense that generated the money to be laundered, the jurisprudence also distinguishes between the promotion and concealment prongs of the federal money laundering statute. In United States v. Jackson, 935 F.2d 832, 842 (7th Cir.1991), the Seventh Circuit noted that the two provisions of 18 U.S.C. § 1956(a)(1)(A)® and 1956(a)(1)(B)® were aimed at different activities, the first at the practice of plowing back proceeds of “specified unlawful activity” to promote that activity, the second at hiding the proceeds of the activity. In United States v. Rosbottom, 763 F.3d 408, 417 (5th Cir.2014), cert. denied, — U.S. -, 135 S.Ct. 985, 190 L.Ed.2d 836 (2015), the Fifth Circuit noted that 18 U.S.C. § 1956(a)(l)(A)-(B):
prohibits using the proceeds of a specified unlawful activity: “(i) with the intent to promote the carrying on of specified unlawful activity [the promotion prong];” or “(ii) knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [the concealment prong].”
Under the federal law, the government can establish guilt under either the concealment prong or the promotion prong. See United States v. Valdez, 726 F.3d 684, 689 (5th Cir.2013).
As noted, La. R.S. 14:230(B)(2) provides that it is unlawful for any person knowingly to give, sell, transfer, trade, invest, conceal, transport, maintain an interest in, or otherwise make available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity. It |]9appears the language “for the purpose of committing or furthering the commission of any criminal activity” in Section (B)(2) is similar to the language “with the intent to promote the carrying on of specified unlawful activity” (or the promotion prong) of the federal statute. See Webster’s II New College Dictionary p. 885 (2001), which provides one of the definitions of “promote” as follows: “To contribute to the progress or growth of: FURTHER.” Our legislature, it seems, deviated from the federal language in requiring only general intent on the part of the offender, whereas to establish money laundering under the promotion prong of § 1956(a)(1), the government must show that the money transaction was conducted with the specific intent to promote the carrying on of the unlawful activity. See Valdez, 726 F.3d at 690-91; United States v. Miles, 360 F.3d 472, 477 (5th Cir.2004); United States v. Brown, 186 F.3d 661, 670 (5th Cir.1999).
Despite the differences, La. R.S. 14:230(B)(2), like its federal counterpart, *44 contemplates that some action be taken on a thing of value, with the scienter that such action be for the purpose of committing (or furthering the committing of) any criminal activity. Under the particular facts of this case, the only actions that could have been performed on U.P.’s checks that had been deposited to the defendant’s business checking account were they were concealed, they had an interest maintained in them, or they were made available. The State, thus, had to prove that the checks were concealed, maintained, or made available for the express purpose of committing (or further committing) criminal activity.
The testimonial and documentary evidence established that there was no attempt to conceal the checks. The checks were consistently and regularly deposited and maintained in the defendant’s business checking account. All of the business transactions between U.P. and the defendant were open and conspicuous. In United States v. Dobbs, 63 F.3d 391, 393-94, (5th Cir.1995), not followed on other grounds, Regalado Cuellar v. United States, 553 U.S. 550, 128 S.Ct. 1994, 170 L.Ed.2d 942 (2008), Dobbs, a cattle fanner and rancher in Texas, borrowed $175,000.00 from Farmers Home Administration (FmHA) to start a cow-calf operation, with the first of seven annual installments due January 1, 1990. Under his agreement with FmHA, Dobbs would purchase approximately 330 cows and bulls to produce calves for resale. FmHA paid off Dobbs’s outstanding bank loans to Farmers & Merchants Bank (F & M) except for one equipment loan, and immediately advanced him $16,000.00 for operating expenses. After FmHA refinanced the F & M loan, Dobbs agreed not to obtain any other bank loans to purchase additional cows. In 1989, Dobbs’s entire cattle herd was quarantined by the State after certain cattle tested positive for brucellosis. Dobbs subsequently advised his County Supervisor for the FmHA that he had sold all of his cattle for slaughter without authority and did not have enough money from the proceeds to pay both FmHA and F & M. FmHA agreed to give Dobbs a new loan and schedule payments over seven years if he applied the proceeds from his unauthorized sale to his outstanding FmHA loan. Dobbs agreed. In 1991, Dobbs borrowed approximately $101,000.00 from F & M in five separate notes to buy approximately 190 head of cattle. Dobbs signed a security agreement in which he agreed not to sell any collateral without prior written consent. In addition to its dealings with Dqbbs, F <& M made loans to Dobbs’s children to buy another 120 head of cattle. Although the loans were made in the children’s name, the bank knew that Dobbs would manage the cattle bought in his children’s names. In April 1992, the FmHA sent Dobbs a letter informing him of a collateral inspection. Dobbs responded by informing the FmHA that he had sold all of the cattle forming the basis of the FmHA’s collateral. Although he brought in receipts for the cattle he did not repay the outstanding balance of approximately $182,000.00. In July 1992, F & M bank also tried to inspect its collateral. Dobbs responded by informing the bank that he had sold all of its collateral and had used all of the 121 proceeds for operating expenses. Dobbs owed approximately $85,000,00 to F & M. Dobbs was charged with and convicted of bank fraud and eight counts of money laundering. In reversing the money laundering convictions, the Fifth Circuit made the following findings:
One of the money laundering counts charges that Dobbs deposited approximately $4500 of the cattle sale proceeds ‘ into his wife’s bank account. The Dobbses had decided to use the account *45 as their main operational account. The money was -used to pay the ordinary expenses of the ranch and household. The other money laundering count charges that Dobbs converted a cattle sale check for approximately $37,000 into a cashiers check for $37,000 and then converted the cashiers check into four separate cashier’s checks. These smaller cashiers checks were then used to pay for ranch and family expenses. The government concedes that Dobbs’ records reflected use of the funds to pay ranch and family expenses. These transactions were open and notorious-at least as much as the' typical bank transactions can be. Dobbs also did not use any third parties to make purchases or otherwise hide his identity when making the transactions....
The court [in United States v. Sanders, 929 F.2d, 1466, 1472 (10th Cir.), cert. denied, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991), not followed on other grounds, Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ] held that the very purpose of the statute was to reach commercial transactions intended at least in part to disguise the relationship of the item purchased with the person providing the illegally obtained proceeds. [ ]; see also, United States v. Gonzalez-Rodriguez, 966 F.2d 918, 925 (5th Cir.1992) (citing this holding in Sanders with approval). The court found that the fact the defendant and her husband were present at the car purchases and were readily identified by the respective sales person plus the fact that the cars were used in a conspicuous manner provided an insufficient basis to support a conviction for money laundering. Sanders, 929 F.2d at 1472-73. Similarly in this cáse where the use of the money was not disguised and the purchases were for family expenses and business expenses is not disputed, there is also insufficient evidence to support the money laundering convic- , tion.
Dobbs, 63 F.3d at 397-98.
As- with Dobbs, the defendant herein never concealed his money or attempted to move it from his checking account; nor did the defendant conceal his identity. The defendant’s identity as the seller of fuel to U.P. was always known and available, and U.P., by virtue of the terms of the contract it had with the defendant, had at all times direct access to the defendant’s books, files, and | ^accounting information. In the Direct Locomotive Fueling Agreement between the defendant and U.P., Section 18, titled “CONTRACTOR’S BOOKS AND RECORDS,” provided:
Contractor shall keep an accurate record of all Fueling Activities furnished and performed by Contractor hereunder. An authorized representative of Railroad shall, at all reasonable times, for audit purposes, have free and full access to the accounts, books and records of Contractor relating to Contractor’s operations hereunder during the term of this Agreement and for a period of three years following expiration or termination of this Agreement. Contractor shall immediately repay to Railroad all amounts to Railroad that are not supported by accurate and valid records of Contractor..
Moreover, the State did not establish that there was ever any criminal activity associated vnth the' maintaining or the availability of the checks. After the checks were deposited into the defendant’s business account, the money either remained in the account or was used for typical business expenses. Agent Paddy testified that based on his investigation, he had no idea what the defendant did with the money he was paid by U.P. He stated *46 that the scope of his investigation did not include what the money was used for, other than for paying legitimate bills and business expenses. As far as Agent Paddy knew, the defendant deposited the checks straight into the bank. Loretta Robillard, who worked for the defendant in the accounts receivable department (she took in the checks and deposited them), testified that the checks from U.P. were deposited into the defendant’s company business account, and that they were used to pay bills and business expenses.
According to Averill, he and Glaser were the only two employees of the defendant who had anything to do with inflating the amounts of fuel on the invoices to U.P. Glaser did not testify at trial. From 1995 to 1997, according to Averill, Glaser was the lead bobtail truck driver for the defendant. As already pointed out, when the other truck drivers filled their trucks up with fuel at the refineries (most often Va-lero Refinery), they were given refinery fuel manifests, indicating the amount of fuel put in the truck, the date, the driver, and other |2apertinent information. The drivers then went to the U.P. train yard and transferred the fuel in their trucks directly into the locomotives. Each driver, as instructed, then handwrote on his manifest the engine number and the amount of fuel he put in that engine. The three or four drivers then turned their manifests over to Glaser, the lead driver. Glaser transferred the information on the fuel manifests onto field tickets; Glaser, however, inflated the amount of gallons that were written on the manifests. Averill, aware of this false information from Glaser, used these field tickets to generate invoices and sent them to U.P. for payment. Averill testified that he paid Glaser to perpetrate this fraudulent billing scheme.
The defendant’s use of “dirty money”— namely, that money paid to Morel by U.P. for gallons of fuel that U.P. never actually received — to pay Glaser to keep inflating the diesel fuel amounts, could have arguably constituted money laundering. This would have been an example of funds being made available for the purpose of committing criminal activity. See Valdez, 726 F.3d at 690-91 (where promotion money laundering was established by the irregular payments that the employer-defendant was making to his employees). Averill paid Glaser, however, from 1995 to 1997, and Glaser was no longer working for Morel during the charged time period of January 20, 1998 to March 6, 1998. Thus, Morel could not have laundered any money through Glaser during this forty-six-day period; Morel could not have laundered any money through Averill during these forty-six days because, during this time, Averill was not paying anyone to inflate numbers, and Averill was not being paid anything to personally inflate the numbers. Averill was still working for Morel during the charged time period, but he specifically testified that he never was paid anything to inflate numbers, other than his regular salary. Thus, since Averill never did anything with the “dirty” money that was sitting in Morel’s business checking account, he could not have laundered any money. Neither Glaser nor Averill during the charged time period, therefore, ^received anything of value (or money) from the defendant for the purpose of keeping the alleged fraudulent billing scheme going.
While not dispositive of the issue, we note that even had Averill been paid by the defendant to inflate numbers during the forty-six-day charged time period, it would still not be clear that the defendant committed money laundering. In United States v. Loe, 248 F.3d 449, 466-67 (5th Cir.), cert. denied, 534 U.S. 974, 122 S.Ct. *47 397, 151 L.Ed.2d 301 (2001), the Loes were charged with and convicted of, among other things, money laundering. In this case, “dirty” money was comingled with “clean” money. The Fifth Circuit stated:
The commingling of assets has placed courts in the difficult position of separating “clean” from “dirty” funds. Although any accounting method employed to this end inevitably exhibits certain “arbitrary” characteristics, a rule of decision is necessary. In United States v. Davis, [226 F.3d 346, 357 (5th Cir.2000), cert. denied, 531 U.S. 1181, 121 S.Ct. 1161, 148 L.Ed.2d 1021 (2001),] we stated the following rule for section 1957 cases involving commingled accounts: “[W]hen the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account.” Davis also implies the converse — that where an account contains clean funds sufficient to cover a withdrawal, the Government can not prove beyond a reasonable doubt that the withdrawal contained dirty money. (Footnotes omitted.)
After pointing out that the Ninth Circuit followed the Davis rule (as stated in United States v. Rutgard, 116 F.3d 1270, 1291-92 (9th Cir.1997), which held that money from a commingled account is presumed to be clean) and noting that the Fourth and Third Circuits employ a presumption contrary to that which it applied in Davis, the Fifth Circuit in Loe, 248 F.3d at 467, reversed the money laundering convictions:
In this case, counts 22-24 were based on transactions originating in a $776,742 transfer from an account containing $2,205,000 paid by Lexington to the Loes. Of the $2,205,000, only $470,790.22 was fraudulently obtained. Since there was enough clean money in the account to cover the $776,742 transfer, the rule of Davis mandates reversal of counts 22-24. No reasonable juror could | ^conclude that these money laundering convictions were warranted beyond a reasonable doubt.
In the instant matter, the amount of diesel fuel at issue during the charged time period was about two million gallons. From that amount, the State alleged that the defendant overcharged U.P. by about 110,000 gallons; thus, according to the State, the defendant charged U.P. for about $55,000.00 worth of fuel that it did not provide over a forty-six7day period. The alleged “dirty” money amounted to 5.5 percent of all the money.
A motion for postverdict judgment of acquittal raises the question of the sufficiency of the evidence. State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). A postverdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. La.C.Cr.P. art. 821(B). In its written reasons for granting the motion for postver-dict judgment of acquittal, the trial court stated it was adopting the defendant’s reasons in his postverdict judgment of acquittal memorandum. To the extent the State did not prove its case against the defendant beyond a reasonable doubt, we agree with the trial court.
Assuming that the U.P. checks during the charged time period had value at the time of deposit in the defendant’s bank account, there was nothing illegal done with the money after deposit. The checks were simply maintained in the business account and, according to witnesses, some of the money was used to pay bills. Paying the bills of a business is legitimate and *48 is not, by definition, committing or furthering the commission of criminal activity. While a fraction of the money earned by the defendant over the relevant forty-six-day period to pay the bills may have been obtained through ill-gotten measures, e.g., fraud, theft, padding, overbilling, or overcharging, the use of the “dirty” money for legitimate means |«,fidoes not constitute money laundering. The defendant’s identity was always knqwn, the paying of the bills and incurring of other business expenses were open and notorious, and the money obtained from the alleged padding always went directly into the defendant’s business account and nowhere else. See Brown, 186 F.3d at 662-68, 668 n. 13, 670 (where the defendant, who operated an automobile dealership and conducted a significant amount of legitimate business also engaged in a fraudulent scheme to charge some customers more than the amount authorized by state law for document and title fees, was convicted of money laundering, the Fifth Circuit reversed the conviction, findihg insufficient evidence to establish that" the charged expenditures were used with the intent to promote the defendant’s fraudulent scheme, as opposed to his legitimate business activities, and concluded that the evidence showed instead that the allegedly laundered funds paid for the dealership’s basic operations, such as parts, paints, materials, trade-in car purchases, a computer system lease, glass repair, and a health plan).
The defendant never sought to conceal, manipulate, or change the amount of money that was deposited in the business checking account. During the forty-six-day charged time period, the money simply sat there and was used to pay for bills, expenses, and salaries. Prior to the charged period, when employees were scratching out amounts of fuel on the manifests, the defendant (through his employees) was arguably scratching out fuel amounts to conceal the truth.- What was being concealed, however, were numbers on pieces of paper, or the manifests. La. R.S. 14:230(B)(2) requires concealment “of anything of value” — in this case, the checks; and the checks were never concealed. Moreover, there was no scratching out óf any information during the charged time period. See United States v. Olaniyi-Oke, 199 F.3d 767, 771 (5th Cir.1999); Brown, 186 F.3d at 669-71.
| a7The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact’s determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder’s determination of guilt. State v. Taylor, 97-2261 (La.App. 1st Cir.9/25/98), 721 So.2d 929, 932. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises . a reasonable doubt. See State v. Moten, 510 So.2d 55, 61 (La.App. 1st Cir.), writ denied, 514 So.2d 126 (La.1987).
The conflicting testimony and physical evidence introduced at trial in this matter, as well as a propér understanding and application of the law at issue, convinces us that a rational fact finder could not have concluded that the evidence excluded the reasonable hypothesis that the defendant never laundered any of the money he obtained from U.P. during the charged time period. We have carefully reviewed the *49 entire record and conclude the jury did not act rationally in finding the defendant guilty of money laundering. While we are mindful not to substitute our judgment of what we think the verdict should have been for that of the jury,'we must conclude the jury’s improper verdict suggested impermissible speculation and/or a fundamental misunderstanding of the law at issue in determining the defendant’s guilt. See Mussall, 523 So.2d at 1311. Under the facts of this case, we conclude that any rational trier of fact, after viewing all of the evidence as favorably to the prosecution as a rational fact finder can, would necessarily have a reasonable doubt as to the defendant’s guilt. ' No rational trier of fact could haveJjjfound the essential elements of the crime of money laundering beyond a reasonable doubt. See Mussall, 523 So.2d at 1311-12.
Accordingly, the trial court did not err in granting the defendant’s postverdict judgment of acquittal.

DECREE

For these reasons, we affirm the trial court’s ruling, granting the motion for a postverdict judgment of acquittal.
TRIAL COURT RULING GRANTING THE MOTION FOR POSTVERDICT JUDGMENT. OF ACQUITTAL AFFIRMED.
WELCH, J., dissents and assigns reasons.

. In the instant matter, the State specifically sought to charge the defendant under the provision of La. R.S. 14:230(B)(2) only. The State argued at the motion to quash hearing, and the trial court agreed, that Odom did not apply to the instant matter because the prosecution under Odom was pursuant to the provisions under La. R.S. 14:230(B)(1), (3), (5), and (6), but particularly not provision (B)(2). Provision (B)(2) applies to "anything of value,” and the trial court found that checks fell within the meaning of “anything of value.”

. Subsections (d) and (e) were added in the 2010 change to the law (La. Acts 2010, No. 608, § 1):
(d) Electronic or written checks, drafts, money orders, traveler’s checks, or other electronic or written instruments or orders for the transmission or payment of money.
(e) Investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery.